SIERRA MILITARY HEALTH
SERVICES, INC.,
Plaintiff,

v.

The UNITED STATES, Defendant,

Triwest Healthcare Alliance Corp.,
Defendant–Intervenor,

Humana Military Healthcare Services,
Inc., Defendant–Intervenor,

and

Health Net Federal Services, Inc.,
Defendant–Intervenor.

No. 03–2173 C.

United States Court of Federal Claims.

Nov. 25, 2003.

Thomas C. Wheeler, Washington, D.C., attorney of record for the plaintiff.

Kenneth S. Kessler, Department of Justice, Washington, D.C., with whom was Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Brian M. Simkin, Assistant Director.

Antony B. Klapper, Washington, D.C., Tri-West Healthcare Alliance Corp., Defendant–Intervenor.

Peter L. Wellington, Washington, D.C., Humana Military Healthcare Services, Inc., Defendant–Intervenor.

Thomas P. Humphrey, Washington, D.C., Health Net Federal Services, Inc., Defendant–Intervenor.

## OPINION

MEROW, Senior Judge.

Sierra Military Health Services, Inc. ("Sierra") seeks equitable relief pursuant to 28 U.S.C. § 1491(b)(2). As an unsuccessful offeror for the contract to provide health care for the North Region, under the Department of Defense ("DOD") TRICARE program, plaintiff timely filed a protest with the General Accounting Office ("GAO") contesting the award of this contract to Health Net Federal Services, Inc. ("Health Net"). Under the Competition in Contracting Act ("CICA") a timely filed protest requires that the agency direct the contractor to cease performance under the contract while the protest is pending, except that the head of the procuring activity may authorize performance, notwithstanding the protest, upon a written finding that:

(I) Performance of the contract is in the best interests of the United States; or

(II) Urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest;

31 U.S.C. § 3553(d)(3)(C).

By a fifteen page memorandum, dated September 5, 2003, Ronald Richards, Director of Acquisition Management and Support for the TRICARE Management Activity ("TMA"), as the head of the contracting activity that awarded the TRICARE Managed Care Support Contract/North to Health Net on August 21, 2003, authorized contract performance by Health Net, notwithstanding Sierra's pending GAO protest. Mr. Richards grounded his decision "on the basis that contract performance will be in the best interests of the United States." Administrative Record ("AR") 1.

On September 15, 2003, plaintiff filed its motion for a temporary restraining order ("TRO") and a preliminary injunction addressed solely to the September 5, 2003, "override" decision by Mr. Richards. The merits of the protest over the award of the contract to Health Net remain with the GAO, whose decision on this protest is expected by December 8, 2003. The Court of Federal Claims has the requisite jurisdiction to consider protests concerning override decisions made pursuant to CICA. *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286 (Fed.Cir.1999).

By Order, filed September 22, 2003, pursuant to RCFC 65, plaintiff's application for temporary equitable relief was consolidated with the request for an injunction and both made subject to resolution by dispositive motions based on the administrative record filed by defendant. However, following a decision on September 15, 2003, *PGBA, LLC v. United States,* 57 Fed.Cl. 655 (2003), which became available on September 29, 2003, in which a preliminary injunction was entered against an override decision by Mr. Richards with respect to a GAO protest pending on another TRICARE contract, plaintiff renewed its TRO motion. A hearing on this motion was held on October 10, 2003. On October 16, 2003, the court denied plaintiff's TRO motion. After subsequent briefing on

plaintiff's motion for preliminary injunction was completed, plaintiff then filed a motion for reconsideration of the court's denial of the TRO. After briefing on plaintiff's motion for reconsideration was completed, the matter is now before the court on plaintiff's motion for preliminary injunction and its motion for reconsideration. Defendant and intervenors have also filed motions for summary judgment on the administrative record. For the reasons below, plaintiff's motions are **DENIED**. Defendant and defendant-intervenors' motions for summary judgment are **GRANTED**.

## FACTS

Health care and related administrative services for dependants of active duty military service members and for retired service members and their dependants are currently being provided by seven separate Managed Care Support Contracts ("MCSCs") covering the United States, as divided into eleven different geographical regions. A MCSC requires: establishing and managing a network of health care providers; enrolling beneficiaries in the TRICARE Prime (health maintenance organization option); operating a medical management program; processing health care claims; providing customer services; education of providers and beneficiaries regarding TRICARE programs and procedures; operating local TRICARE Service Centers; and providing government access to data. The current contracts were originally awarded starting in 1994 and all option periods have been exhausted. Extensions have been negotiated under statutory authority in DOD Appropriations Acts. The current contract expiration dates commence in 2004, starting with Region 11 on February 29, 2004. The procurement at issue in this litigation is part of the transformation of the Military Health System ("MHS") which DOD has planned in connection with the expiration of the 1994 contracts. As a part of this next generation of TRICARE contracts ("T–Nex") the current eleven geographical regions will be reduced to three regions—North, South, and West. The current seven contracts will be reduced to three contracts, one for each region. Certain functions in the existing contracts have been carved out and awarded as separate nation-wide contracts. An example is the contract at issue in the *PGBA* case cited previously. That contract provides for processing all claims from beneficiaries with dual eligibility for TRICARE and Medicare. The delivery of health care by the contractor is not involved.

The Request for Proposals ("RFP") for the contract which forms the basis for the instant suit covered all three regions, but provided for the award of three separate contracts to three separate contractors. The RFP provided (in relevant part):

The Government will award three contracts for managed care support services to three different sources under this solicitation. There will be one area per contract award. All prospective offerors may submit a proposal for any one or all three of the contract areas; however, no one offeror will be awarded more than one contract.

Pursuant to this RFP, Sierra submitted only an offer for the North Region contract. Offers for the North Region were also submitted by Health Net and Aetna government Health Plans, LLC ("Aetna"). For the South Region, offers were submitted by Health Net and Humana Military Healthcare Services, Inc. ("Humana"). For the West Region, offers were submitted by Health Net and TriWest Healthcare Alliance Corp. ("TriWest"). Awards were made by TMA to Health Net for the North Region, Humana for the South Region, and TriWest for the West Region. Agency level protests were filed by Health Net concerning the South and West awards. By memoranda, both dated September 18, 2003, Mr. Richards authorized contract performance for the South and West Regions, pursuant to FAR § 33.103(f)(3), finding that performance would be in the best interests of the United States or that urgent and compelling circumstances existed. Aetna also filed a protest addressed to the North Region award to Health Net and on September 18, 2003, supported by a memorandum, dated September 17, 2003, Mr. Richards authorized contract performance notwithstanding the Aetna protest on the basis that this "will be in the best interests of the United States." AR 38.

Because of the asserted interconnected nature of the T–Nex MCSC awards, plaintiff's motion for an injunction seeks to overturn TMA's overrides for all three contracts, *i.e.*, plaintiff seeks to halt performance of the three T–Nex contracts awarded to Health Net, Humana, and TriWest. These contractors have intervened in this proceeding and participated in the briefing and arguments.

The performance which plaintiff seeks to halt is the transition work which must be completed before Health Net, Humana, and TriWest commence actually providing health care to beneficiaries under the new revised TRICARE T–Nex contracts. Given past experience with problems created by a short transition period, and based upon a congressional nine month transition guideline for new TRICARE contractors, 10 U.S.C. § 1095c(b), and a GAO report critical of a prior six month transitional period, TMA decided to provide a ten month transition period for the T–Nex contractors, with the exception that old Region 11, which is part of the new West Region contract, will have a nine month period. Under this schedule, Health Net will transition into the North Region contract area in order to be able to commence providing services to beneficiaries in old Region 1 on September 1, 2004. Until September 1, 2004, Sierra will continue to provide TRICARE Services for old Region 1 under its current contract.

The September 5, 2003 decision by Mr. Richards to authorize contract performance, notwithstanding the pending GAO protest, is based on the asserted impact of a suspension in three areas: (1) the operational impact on the effective and efficient administration of TRICARE; (2) the impact on TRICARE beneficiaries; and (3) the cost impact to the United States of continued suspension of contract performance. Mr. Richards relies on the need for the full scheduled transition period (9–10 months) to be maintained with the result that suspension of the transition work until December 8, 2003 will, correspondingly, delay the commencement of services under the T–Nex MCSCs. Such a delay would also require extending the expiring MCSCs in the old regions.

Mr. Richards indicates that because the implementation of these contracts must be done in a highly coordinated, synchronized and time-phased way, a suspension of transition work would have a profound effect on the T–Nex program. The transition is phased so as to avoid starting health care delivery within two old regions, consolidated into one new MCSC, at the same time. Among other reasons, full transition time is needed, given the limited government resources for benchmark testing of contractor systems as well as allowing time for system development and interface testing with government systems.

With respect to beneficiary impact, Mr. Richards notes that the T–Nex contracts provide significant improvements in the delivery of health care and the government's management of costs. Dissatisfaction with the existing TRICARE program has been focused on access to care and ease of using the system. The T–Nex contracts provide a contractor performance guarantee. Also it is noted that health care for dependents is an important morale factor for active duty personnel, and that T–Nex contract support assists in training military treatment facilities' personnel. A delay in commencing T–Nex contract delivery of services will deprive beneficiaries and the government of these improvements for the delay period involved.

## DISCUSSION

### I. Standing

The initial issue which must be addressed is whether plaintiff has standing to seek relief halting transition performance under the T–Nex contracts awarded to Humana for the South Region and TriWest for the West Region. The Federal Circuit has held that "standing is a threshold jurisdictional issue, which implicates Article III of the Constitution and therefore may be decided without addressing the merits of a determination." *Castle v. United States*, 301 F.3d 1328, 1337 (Fed.Cir.2002) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed.Cir.2002)). The party invoking federal subject matter jurisdiction bears the burden of establishing that it has standing. *See Myers*, 275 F.3d at

1369 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *McRae Indus., Inc. v. United States,* 53 Fed.Cl. 177, 179 (2002) ("The burden of establishing the court's subject matter jurisdiction rests with the party seeking to invoke it."). In this case, Sierra seeks to enjoin performance of the West, South, and North Region T–Nex contracts pending resolution of several post-award bid protests filed before the GAO and the federal agency.

This court's jurisdiction to review an agency's override of the CICA automatic stay provision is governed by the Tucker Act, 28 U.S.C. § 1491(b)(1). *See RAMCOR,* 185 F.3d at 1291. 28 U.S.C. § 1491(b)(1) provides that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or any alleged violation of statute or regulation in connection with a procurement ...." The definition of "interested party" in section 1491(b)(1) is construed in accordance with CICA, 31 U.S.C. § 3551(2). *See Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294 (Fed.Cir.2001) ("*AFGE*"). In *AFGE,* the Federal Circuit held that "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 258 F.3d at 1302. Sierra contends that it is an interested party in all three awards because it was an actual offeror in response to the TMA's solicitation for the North contract and is directly affected by the TMA's award decisions in the North, South and West Regions. Health Net, the awardee for the North Region, also filed agency level protests for the South and West awards. Health Net would then be ineligible to perform the North contract if it was ultimately awarded either the South or West contracts as a result of its protests. Sierra contends that as one of the original offerors on the North contract it would then be considered for the North award. Defendant and intervenors, Humana and TriWest, contend that Sierra lacks standing to challenge the override decisions issued in the South and West

Regions because it did not submit a proposal for either of these contracts and has not protested these awards.

The Federal Circuit has held that a protestor lacks the direct economic interest where the contractor did not submit a proposal; the bidder withdrew from the procurement; and where a bidder rated below second in the agency's evaluation. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1334 (Fed.Cir.2001) (citing *MCI Telecomm. Corp. v. United States,* 878 F.2d 362 (Fed.Cir.1989); *Fed. Data Corp. v. United States,* 911 F.2d 699 (Fed.Cir.1990); *United States v. Int'l Bus. Machs. Corp.,* 892 F.2d 1006 (Fed.Cir.1989)). In *MCI,* the Circuit held that a protestor who failed to submit a bid or protest the solicitation before the close of the proposal period lacked standing because it was not an interested party. 878 F.2d at 364–65. According to the court, "[s]ince the opportunity to qualify as an actual or prospective bidder ends when the proposal period ends, MCI's stated intention to submit a proposal in response to any resolicitation, and its efforts to secure a resolicitation by filing a protest, can do nothing to create the necessary interested party status." *Id.* at 365. Additionally, a prospective bidder must "establish that it had a substantial chance of securing the award in order to establish standing ...." *Myers,* 275 F.3d at 1370. In *McRae,* 53 Fed.Cl. at 180–81, this court adopted the same reasoning when it held that the protestor lacked standing because it was not an interested party under CICA. The would-be protester lacked the requisite standing because "[n]o action by the government precluded McRae from submitting a bid. Rather, McRae had an opportunity to bid but chose not to do so. Therefore, McRae lacks standing under § 1491(b)(1)." *See also N.C. Div. of Servs. For the Blind v. United States,* 53 Fed.Cl. 147 (2002), *aff'd mem.,* 60 Fed.Appx. 826 (Fed.Cir.2003).

In this case, Sierra is not an actual or prospective offeror on the South or West contracts because it failed to submit a proposal or protest the RFP requirements before the end of the proposal period. The fact that Health Net submitted three separate

proposals for each region demonstrates that Sierra could have easily submitted a proposal for the South or West Regions but chose not to do so. Furthermore, Sierra admits that it is not seeking to challenge the award in either region nor alleges that it intends to submit a proposal if there was a resolicitation. Instead, Sierra relies on its proposal for the North Region as the basis for its claim as an interested party in other regions. However, the RFP explicitly provided that the government would award three different contracts to three different offerors. Under the terms of the solicitation all offerors could submit a proposal for any one or all three of the contract areas. Even if an offeror submitted proposals for each region, it would still only be awarded no more than one contract. Therefore, the RFP required offerors to submit a separate proposal for each region for which they wanted to be considered.

Applying the more generous standard under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, this court held that in a multiple-award solicitation, a protestor only had standing to contest those awards for which it had bid.[1] *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371 (2001), *aff'd on other grounds,* 279 F.3d 985 (Fed.Cir.2002). In *JWK,* the Navy had solicited bids for providing logistic support services for the Naval Air Systems Command. The Navy issued a single solicitation which contemplated awarding five separate contracts for regional sites referred to as LOTS. Plaintiff, JWK, sought to challenge the government's decision to award LOTS IV and V to a single contractor. Under the APA standard, JWK was found not to be an interested party because "it is undisputed that although both LOTS IV and V of the solicitation sought bids on an unrestricted basis, JWK did not at any time during the proposal period, submit offers responsive to those LOTS." 49 Fed.Cl. at 387. This court also found that JWK lacked

"interested party" status "under the more restrictive standards applicable in proceedings before the General Services Contract Board of Appeals." *Id.* at n. 6 (citing *Fed. Data,* 911 F.2d at 704; *MCI,* 878 F.2d at 364–365).

This conclusion is supported by several GAO decisions interpreting the definition of "interested party" under the bid protest statutes.[2] *See AFGE,* 258 F.3d at 1302. For example, in *4th Dimension Software,* 1993 WL 214633, B–251936, 93–1 CPD ¶ 420 (Comp.Gen., May 13, 1993), offerors were invited to submit separate proposals for up to four contracts in functional areas identified as "bid lots." Although the protestor had submitted bids on some of the lots, because it "did not submit a proposal on bid lot 3, or even allege that it would do so if the award was cancelled and the requirement solicited, it lacks the direct economic interest required to maintain a protest on this bid lot." 856 P.2d 428, 1993 WL 216433, *3 (footnote omitted). Similarly, in *Pertex Textile Products, Inc.,* 1990 WL 278559, B–240052, 90–2 CPD ¶ 318 (Comp.Gen., Oct. 19, 1990), a protestor's challenge of the award of twelve Special Item Number ("SINs") contracts to a competitor under a multiple-award solicitation was dismissed except for those SINs for which it had actually submitted a proposal. The GAO held that "Pertex did not submit an offer on, and thus was not in line for the award of, any but one of the items for which UMI was awarded a contract . . . . Pertex is therefore an interested party only for purposes of protesting this one item." 1990 WL 278559, *1 (citing *Radionic Hi–Tech, Inc.,* 1985 WL 53195, B–219116, 85–2 CPD ¶ 230 (Comp.Gen., Aug. 26, 1985)). Sierra contends that as an actual offeror in the North Region, it has standing to challenge the override decisions in all contracts issued in connection with the solicitation. However, Sier-

---

1. Under the APA standard set forth in 5 U.S.C. § 702, a party must prove that 1) it suffered sufficient "injury-in-fact;" 2) that the injury is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision;" and 3) the interests sought to be protected are "arguably within the zone of interests found to be protected or regulated by statute . . . in question." *AFGE,* 46 Fed.Cl. 586, 599 (2000).

2. Although GAO decisions are not binding, this court may afford deference in recognition of GAO's special expertise in procurement cases. *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991) (citing *Honeywell Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989)).

ra did not submit a proposal or protest the solicitation for either the South or West contract and is not eligible for award of these contracts. Therefore, Sierra is not an interested party in the South or West contracts, and lacks standing to seek equitable relief halting their performance. Plaintiff does have standing to contest the September 5, 2003 decision authorizing performance of the North T–Nex contract transition work by Health Net.

## II. Preliminary Injunction

■ In order to obtain a preliminary injunction, plaintiff must demonstrate: "(1) that the movant is likely to succeed on the merits at trial; (2) that it will suffer irreparable harm if preliminary relief is not granted; (3) that the balance of hardships tips in the movant's favor; and (4) that a preliminary injunction will not be contrary to the public interest." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). No single factor is dispositive and an inadequate showing regarding anyone factor may be overcome by the strength of the other factors. *Id.* A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001).

The *PGBA* court held that the standard of review applicable to an action seeking to overturn a post award override decision based, in part, on a "best interests" finding pursuant to 31 U.S.C. § 3553(d)(3)(C)(i), is whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 28 U.S.C. § 1491(b)(4). The analysis in *PGBA* is convincing and this result is adopted here. Thus, it must be determined whether, on the record, the September 5, 2003 override decision lacked a rational basis. *Impresa,* 238 F.3d at 1332; *Ulstein Mar., Ltd. v. United States,* 833 F.2d 1052, 1054 (1st Cir.1987) (Opinion by Davis, J. of the Federal Circuit, sitting by designation).

## A. Likelihood of Success on the Merits

■ Plaintiff bases its argument for equitable relief primarily on *PGBA,* 57 Fed.Cl.

655. In that opinion, the court found that the prerequisites for a preliminary injunction had been established to halt the performance of the T–Nex nationwide contract awarded for the processing of health care claims by beneficiaries having both TRICARE and Medicare eligibility. This is referred to as the TRICARE Duel–Eligible Fiscal Intermediary Contract ("TDEFIC"), and it covers the claims processing service which was carved out of the current eleven regional contracts and not included as a part of the new T–Nex MCSCs for the three regions. However, the facts underlying the *PGBA* court's reasoning to support an injunction do not correspond to the T–Nex transition. First, the *PGBA* court found that the TDEFIC transition period could be shortened and that any delay caused by the stay would not affect all regions. 57 Fed.Cl. at 661–62. The record here supports the need for a full transition period, such that a stay of transition activity will cause a delay in the start of health care delivery under the North T–Nex contract. This is supported by record evidence of past problems with shortened transition periods for health care contracts as reported by the GAO. The evidence further demonstrates that a stay in the North Region would cause disruption to all three regions. Second, the *PGBA* court found that TMA's cost calculations were vastly overstated based on a delay of all regions. Instead, the cost impact of a delay of only Region 11 "would be much less because that region, as defendant admits, involves only 2 percent of the claims in the entire region." 57 Fed.Cl. at 661. This is not the case with the T–Nex transition where the costs savings under the new T–Nex contracts is based on improvements over all three regions. While the actual amounts are in dispute there is no dispute over the fact that the North T–Nex contract will deliver improved service to beneficiaries at cost savings to the government. For example, all network providers will be required to file claims electronically with "projected claims volumes nationally in excess of three million claims per month, achieving estimated savings of 50% or more on each electronic claim . . . ." AR 15.

In stating his reasons for issuing the Sierra override, the Director assumed that "leaving the suspension in place until the protest is decided by GAO would result, at a minimum, in a four month delay of contract performance; i.e., projecting December 8, 2003. as the 100th day for issuance of a GAO decision .... " AR 3. Sierra asserts that TMA relied on several erroneous assumptions regarding the operational impact on TRICARE, the cost of continued suspension, and the potential harm to beneficiaries. Sierra argues that a stay of performance would not require a shortened transition period or delay performance of the new contracts because the transition plan is behind schedule. Plaintiff has relied on the preliminary injunction issued on the TDEFIC contract, the statutory stay of the retail pharmacy contract, and the remaining protests regarding the suite of T–Nex contracts. Furthermore, plaintiff asserts that delays in several projects regarding government information systems have placed the transition to the New Defense Eligibility and Enrollment System ("New DEERS") system significantly behind schedule and will result in TMA delaying its transition plan for the T–Nex contracts. See Declaration of Karen J. Berg, October 24, 2003, Pl.'s Mot. for Recons., Ex. 1. However, the record demonstrates that none of these concerns impacts the T–Nex transition. The preliminary injunction on the TDEFIC contract has been lifted pursuant to the GAO's denial of PGBA's protest. On October 22, 2003, TMA issued an override of the retail pharmacy stay based on the best interests of the government. See Def.'s Opp'n to Pl.s Mot. for Recons., ("Def.'s Opp."), Attach. 3. Finally, plaintiff's claims regarding certain implementation delays are contradicted by the declaration provided by the Program Manager for the New DEERS stating that these "delays will not affect the transition schedule for the new Managed Support Contracts or the TRICARE Dual Eligible Fiscal Intermediary Contract." Declaration of Peter Koste, November 3, 2003, Def.'s Opp., Attach. 1. Thus, there clearly exists a rational basis for the Director's conclusion that a stay of the North Region transition activity would result in either a shortened transition period or delay implementation of health care under the T–Nex contracts.

Sierra also argues that a reversal of the contract award will result in beneficiary confusion resulting from a change in contractors as well as confusion to contractor employees who may have to be moved after a sustained protest. However, the evidence does not support either of these contentions. Sierra will continue to provide health care services to its beneficiaries under its current contract until September 1, 2004. The T–Nex contracts require a ten-month transition period before the actual delivery of services under the new contracts begin. There is nothing in the record to demonstrate that beneficiaries will lose services, be forced to change health care providers, or otherwise suffer if GAO sustains the protest. There is also no evidentiary support that there is confusion at the contractor employee level or that this has affected the delivery of health care services. GAO is scheduled to decide the merits of the protest by December 8, 2003. At oral argument, plaintiff represented to the court that it could negotiate with employees to remain through the end of service requirements to enable it provide health care under its current contract.

Finally, plaintiff submits that TMA's cost calculations based on a stay of transition performance is fundamentally flawed. However, the cost impact which Mr. Richard's override decision details involves the savings anticipated under the T–Nex contracts because of improvements in administration and consolidation of regions and the additional cost involved if existing contracts must be extended. In the override decision, the Director explained that the savings under the new contract included, but was not limited to "the expected impact of increased electronic claims filing, reduction of recidivism and the attendant costs of re-treatment from the improvement of referral management, .... " AR 15. In estimating the cost to the government for four months of health care services under the current MCSCs compared to the new contracts, the Director relied on a cost comparison calculation that estimated the new contracts would save approximately $10.5 million per month. AR 26–30; Second

Supp. Declaration of Ronald G. Richards, Oct. 9, 2003, Def.'s Mot. for Summ. J., Ex. A. Therefore, the Director concluded that a four month delay would cost the government approximately more than $42 million. AR 30. Although plaintiff assails the government's cost analysis as speculative and unsupported, it has failed to show that the analysis or the Director's reliance was irrational or unreasonable. *See Ryder Move Mgmt., Inc. v. United States*, 48 Fed.Cl. 380, 389–90 (2001).

The Director's conclusions regarding the cost of contract extensions is also rational and supported by the record. As stated earlier, all option periods under the original 1994 contracts have been exhausted. Under the current contract extensions, additional option periods were negotiated. The seven current MCSCs were amended to extend the current contracts up to a total of nine option years. The contracts have expiration dates that range from February 29, 2004 through October 31, 2004. Because the Region 11 contract expires on February 29, 2004, TMA concluded that use of the six month extension under FAR § 52.217–8 was not practicable. In the override order, TMA noted that "even with the unilateral six month extensions included in that contract (March–August 2004), a 4–month delay would result in a start of health care delivery on October 1, 2004, or 30 days past the last possible extension under the terms of the contract." AR 4. Sierra asserts that TMA irrationally concluded that exercising the option periods and paying termination for convenience costs would be more expensive than paying phase-in costs for six month unilateral extensions. However, in other regions the schedule already relies on FAR § 52.217–8 extensions to maintain the phase-in of the new MCSCs. AR 9, 22. A delay of four months beyond the extensions already negotiated would require exercise of the option periods or sole source negotiations. TMA concluded that "once exercised, unused portions of the option period following re-activation of a T–Nex contract transition and implementation schedule would have to be terminated for the convenience of the Government and involve termination costs which, generally are a substantial percentage of the overall contract." AR 15. Assuming a four month delay, "this would result in the exercise of additional options for the Region 1, Central Region, and Regions 9/10/11/12 contracts. It would also most likely result in T for C costs in Region 1 and the Central Region and possibly Region 11 . . . ." AR 15.

Sierra responds that TMA failed to consider that the government will be responsible for wasted phase-in costs of approximately $120 million if the award to Health Net is overturned. Health Net's transition costs could include recruiting employees, leases for new offices, equipment and hardware costs, and other costs. *See* Declaration of Kyle Stern, Sept. 10, 2003, Pl.'s Mot. for TRO and Prelim. Inj., Ex. 6. Essentially, plaintiff claims that TMA failed to reduce the amount of savings under the new contract by the amount that it would have to reimburse Health Net if the protest is sustained. However, TMA determined that the savings to the government based on the new contracts would outweigh any potential costs based on reimbursing Health Net for four months of transition work. TMA's decision was based on a memorandum evaluating Health Net's costs and concluding that "Government costs should Sierra win the protest will be minimal. This is in comparison to the potentially much larger Government costs associated with negotiating extensions . . . or for Terminating for Convenience existing contracts where full option periods must be exercised." AR 2. Although plaintiff disagrees with TMA's analysis of the cost to the government if its protest is sustained, the record demonstrates that TMA considered such costs and included them in its override decision. Faced with reliable evidence that the government would incur savings of over $40 million and that extensions of existing contracts would result in termination for convenience costs, the Director's override decision is supported by the record. Accordingly, it is concluded that Mr. Richards' decision as to the operational impact of a stay of transition performance, the impact on beneficiaries of a stay of transition performance and the cost impact of a stay is found to have a rational basis.

## B. Irreparable Harm

When assessing irreparable injury, "the relevant inquiry in weighing this factor is

whether plaintiff has an adequate remedy in the absence of an injunction." *Magellan Corp. v. United States,* 27 Fed.Cl. 446, 447 (1993); *Ceres Envtl. Servs. v. United States,* 52 Fed.Cl. 23, 39 (2002). Initially, Sierra claimed that it would be irreparably harmed if the override is not enjoined because it would suffer various financial harms. Among the injuries alleged were the loss of its employees, increased borrowing costs due to a lack of a long-term contract, decreased stock prices of its parent corporation, duplicate costs from dealing with two contractors, and problems with its beneficiaries and subcontractors. However, these are not the types of harm that constitute irreparable injury. It is clear that "these potential losses are primarily monetary. While these losses may be substantial, they are not irreparable." *OAO Corp. v. United States,* 49 Fed. Cl. 478, 480 (2001); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 364, 369 (2001); *Minor Metals, Inc. v. United States,* 38 Fed.Cl. 379, 381–382 (1997) ("However, economic loss without more, does not seem to rise to the level of irreparable injury.") (citing *Zenith Radio Corp. v. United States,* 710 F.2d 806, 810 (Fed.Cir.1983)). In a similar case involving transition under the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), the District Court for the District of Columbia rejected the claim that the contract awardee would become so entrenched during transition that the protestor would be irreparably harmed without an injunction. The court held that " 'economic loss does not, in and of itself, constitute irreparable harm.' Only economic loss that threatens the survival of a movant's business constitutes irreparable harm." *Found. Health Servs. v. United States,* 1993 WL 738426 (D.D.C. Sept. 23, 1993). Moreover, "it is settled law that no assurance exists that a contractor will receive an award . . . ." *OAO Corp. v. United States,* 17 Cl.Ct. 91, 105 (1989). It is clear that most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract. Additionally, there is no evidence that any loss of its employees is a result of Health Net's transition work. *See* Declaration of Kathleen Richard, Oct. 9, 2003, ¶ 16.

As to irreparable harm to Sierra if transition work continues, Sierra now claims mainly that it stands to lose its incumbency advantage if it participates in transitional activity with Health Net in old Region 1 or Health Net performs transition work with Humana in old Regions 2 and 5 which will also be a part of the T–Nex North contract. Essentially, plaintiff asserts that Health Net's performance of the transition work will result in a *fait accompli* because Sierra will no longer be in a position to compete in the event of a resolicitation. The cases cited to support this proposition, *Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 744 (2000) and *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 571 (2000) involved lost business and lost profits, "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract . . . ." *Overstreet,* 47 Fed.Cl. at 744. In this case, Sierra will not lose business and profit on the T–Nex contract. It is required to continue performing its TRICARE health care contract in old Region 1 until September 1, 2004. This is not a situation where a new contractor now steps in and performs the required work, thereby depriving Sierra of business and profit. Instead, Health Net's performance of the transition work will not affect Sierra's ability to deliver health care services under the new T–Nex contract. In the event that its protest is sustained, Sierra will still have the opportunity to obtain the contract.

Plaintiff's claim of incumbency advantage is speculative and does not demonstrate irreparable harm. Sierra's argument is that its incumbency in Region 1 has enabled it to develop a greater understanding of TMA operations in the North Region. Unlike PGBA, which processed approximately 82% of the claims under the TRICARE program, Sierra is only providing services for one of the three North Regions. Additionally, Health Net is the current contractor for regions 6, 9, 10, 11, and 12. Sierra's experience has not provided it with such an incumbency advantage that will suffer to an irreparable level as a result of the transition. No adequate showing of irreparable damage has been made, if transition work goes forward, such as would de-

prive Sierra of its right to compete for the T–Nex North contract in the event GAO recommends corrective action in the pending Sierra or Aetna protests.

Furthermore, Sierra's argument that Health Net would be unfairly advantaged is entirely speculative. If undue advantage were found to exist, this could be obviated in any corrective action proposed by GAO. If Health Net is successful on either of its protests before the agency on the South or West regions, then it will no longer be eligible to compete for the North region if GAO were to propose corrective action on Sierra's or Aetna's protest. If Health Net is no longer competing for the North T–Nex contract, then any information it has gained during the transition process will have no effect whatsoever on Sierra's ability to compete against Aetna for the award. Sierra argues that Health Net will be competitively advantaged by the ability to develop its provider network and improve its infrastructure in the North Region. At oral argument, plaintiff conceded that Health Net could proceed with these efforts on its own even with a stay. Health Net will not benefit from the fact that its transition costs will be lower due to its current performance. In 31 U.S.C. § 3554(b)(1), Congress provided that the Comptroller General shall make recommendations in a corrective action "without regard to any cost or disruption from terminating, recompeting, or reawarding the contract." As stated in the Aetna override, "any corrective action by the agency will include removing transition costs as a comparative evaluation factor between competing offerors on any revised proposals." AR 39. Thus, plaintiff will not be unduly harmed by a failure to stay performance during the transition period.

Sierra asserts that the agency will be unable to address any organizational conflict of interest ("OCI") under FAR § 9.5 as a result of Health Net's access to nonpublic information about T–Nex gained during performance of the transition work. A conflict may exist where "a firm has access to nonpublic information as part of its performance of a government contract and where that information may provide that firm a competitive advan-

tage in a later competition for a government contract." *Aetna Gov't Health Plans, Inc.; Foundation Health Fed. Servs., Inc.,* 1995 WL 449806, B–254397.15, 95–2 CPD ¶ 129, *8. The FAR provides that contracting officers must "avoid, neutralize, or mitigate significant potential conflicts before contract award." FAR § 9.504(a)(2). It is important to note that contracting officials "have broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition." *DGS Contract Serv., Inc. v. United States,* 43 Fed.Cl. 227, 234 (1999) (quoting *Rockville Mailing Serv., Inc.,* 1996 WL 166465, B–270161.2, 96–1 CPD ¶ 184 (Comp. Gen. April 10, 1996)). Previous GAO decisions have held that "the disclosure of information to equalize competition is an appropriate alternative to eliminating an offeror from a competition due to prior disclosure of information that could result in an unfair competitive advantage." *Cowperwood Co.,* 1996 WL 738440, B–274140.2, 96–2 CPD ¶ 240 (Comp.Gen. Dec. 26, 1996) (quoting *KPMG Peat Marwick,* 1993 WL 476704, B–251902.3, 93 CPD ¶ 272 (Comp.Gen. Nov. 8, 1993)); Cf. *Winstar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 763 (1998) (citing *Versar, Inc.,* 1994 WL 120013, B–254464.4, 94–1 CPD ¶ 230 at *7 (Comp.Gen. Feb. 16, 1994)) ("An offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated."). Thus, plaintiff's claims that it will be competitively disadvantaged by Health Net's transition work are entirely speculative and do not constitute irreparable harm.

Moreover, as discussed in *PGBA,* 57 Fed. Cl. at 658 n. 3, the basic reason for the CICA provision halting contract performance on the filing of a protest with the GAO is to ensure agency consideration of the ensuing GAO decision. In certain situations, a stay is necessary to prevent the contract from being completely fulfilled such that there is no need for a recompetition. See *Lear Siegler, Inc. v. Lehman,* 842 F.2d 1102, 1105(9th Cir.1988), *modified in unrelated part on reh'g,* 893 F.2d 205 (9th Cir.1989); *DTH Mgmt. Group v. Kelso,* 844 F.Supp. 251, 254–55 (E.D.N.C.1993). In the usual situa-

tion where a contract is for the purchase of items or the construction of a building, continued performance during the protest period could produce a *fait accompli*, in that substantial performance would render any subsequent GAO recommendation for resolicitation impractical to carry out. That is not the case with the instant procurement. Sierra will continue to perform its existing contract and provide health care in old Region 1 until September 1, 2004—long beyond the December 8, 2003 point at which the GAO decision is anticipated. Any recommended corrective action by GAO would then undoubtedly require that the existing Sierra Region 1 contract be extended beyond its present expiration date, but as Sierra remains the performing health care contractor during this protest period, this could be accomplished with minimum disruption.

### C. Balance of Hardships

On the balance of hardships, the issue does not result in a decision favorable to plaintiff. The transition work faced by Health Net is complex, and a stay would be disruptive. A major purpose for the transformation of the MHS which is reflected in the T–Nex health care contracts is to improve service to the beneficiaries. Delay in providing improved benefits is a hardship for those concerned. During the protest period, plaintiff is not financially disadvantaged. Health Net currently holds three MCSCs that will expire in 2004. These are for old Region 11, which will be in the West Region T–Nex contract awarded to TriWest, old Region 6, which will be in the South Region T–Nex contract awarded to Humana, and a combined contract for old Regions 9, 10, 12 and Alaska which will also be a part of the West Region T–Nex contract. The T–Nex contract awarded to Health Net for the North Region includes old Region 1, now served by Sierra and old Regions 2 and 5 now served by Humana.

Transition work for Health Net will involve negotiating leases for TRICARE service centers in the North Region together with a regional headquarters and subregional office locations. Health Net plans to utilize employees from its current TRICARE opera-

tions in old Regions 6, 9, 10, 11, and 12 to staff operations in the North Region, requiring coordination with the transition out in those areas. Training of new staff is required. The transfer of claims data and beneficiary records must be arranged. A network of health care providers must be implemented. TriWest and Humana indicate the need to complete similar transition work in order to begin service to beneficiaries by June 1, 2004, in a portion of the West Region and by August 1, 2004, in a portion of the South Region. A delay in Regions 2 and 5 would affect Humana's ability to shift workers from these regions to areas under the new T–Nex contract. Transition work is asserted to improve Health Net's ability to compete in any resolicitation, but to the extent this might present a hardship to plaintiff, the issue can be addressed in any new award evaluation which may occur. Considering that plaintiff has failed to show that TMA's override decision lacked a rational basis, the weighing of the hardships imposed does not favor an injunction. It is concluded that, on balance, the hardship issue remains essentially neutral.

### D. Public Interest

Plaintiff contends that a stay of the transition work would serve the public interest by "protecting the integrity of the procurement process." *Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370, 1382 (E.D.Va.1993) (citing *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 866–67 (D.C.Cir.1970)). It is clear that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Seattle Sec. Servs. v. United States,* 45 Fed.Cl. 560, 572 (2000). To this end the GAO protests must proceed to resolution without hindrance to consideration of the resulting determination. In this case, a *fait accompli* will not occur from the continued performance of transition work and there will be no impediment to consideration of the GAO protest decision. The GAO is poised to issue its decision on the merits of Sierra's protest on December 8, 2003.

Moreover, the public interest in maintaining the morale of our military personnel by providing improved health care benefits to dependents and to retired personnel sooner rather than later must be considered. Available and adequate health care for retired personnel is, itself, a matter of considerable public interest. *See Schism v. United States,* 316 F.3d 1259, 1301 (Fed.Cir.2002) (Dissent). Finally, the presence of the override provision in the CICA was an important element in the decisions rendered in *Ameron v. U.S. Army Corps of Engineers,* 809 F.2d 979, 997 (3rd Cir.1986) and *Lear Siegler, Inc. v. Lehman,* 842 F.2d at 1110–1111, sustaining the constitutionality of the Act. The exercise of the authority expressly provided in the CICA to authorize continued contract performance should not be viewed with suspicion. Given the need for a full transition cited by Congress, it was reasonable for TMA to conclude that reinstituting the stay would cause serious disruption to the entire suite of T–Nex contracts. Plaintiff's assertion that the override decision will cause confusion among military beneficiaries if the protest is sustained is not supported by the record. *See Found. Health Fed. Servs. v. United States,* 1993 WL 738426 (D.D.C. Sept. 23, 1993). Sierra will continue under its current contract and its beneficiaries will not lose access to its health care services. Where, as here, the "best interests" determination is found to be rationally based, and other factors do not point to success on the merits, a preliminary injunction can not be issued.

## CONCLUSION

Accordingly, it is **ORDERED**:

(1) Plaintiff's Motion for Preliminary Injunction shall be **DENIED**;

(2) Plaintiff's Motion for Reconsideration of the court's order, filed October 16, 2003 is **DENIED**;

(3) Defendant's and Intervenors' Motions for Summary Judgment are **GRANTED**;

(4) Final Judgment shall be entered **DISMISSING** the Complaint, with **NO COSTS** assessed.