**CHAPMAN LAW FIRM CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 04–1418C.**

United States Court of Federal Claims.

Oct. 13, 2004.

1. This Opinion was originally filed under seal on October 1, 2004, subject to review by the parties

*REDACTED OPINION* [1]

MEROW, Senior Judge.

Chapman Law Firm Co., LPA ("Chapman") filed this action on September 8, 2004, to challenge an August 31, 2004 decision by the Chief Procurement Officer, United States Department of Housing and Urban Development ("HUD") to override a stay of contract performance which occurred, pursuant to 31 U.S.C. § 3553(d)(3)(A)(ii), on August 17, 2004, upon the filing of a protest at the Government Accountability Office ("GAO"), concerning the award by HUD of a contract. Defendant opposes Chapman's challenge and

for material subject to a Protective Order.

defends HUD's override decision. The issues concerning the override decision are presented by dispositive motions based on an administrative record, supplemented by affidavits submitted by both parties.[2] A hearing on the pending motions was held on September 23, 2004.

### Facts

On August 27, 1999, HUD awarded Contract No. C–OPC–21519 to Golden Feather Realty Service, Inc. ("GFR"), covering the area of Illinois, Kentucky, Tennessee and Indiana, "to provide Management & Marketing services to successfully manage single family (1–4 units) properties owned by or in the custody of the Department of Housing and Urban Development (HUD), to successfully market those single family properties which are owned by HUD, and to successfully oversee the sales closing activity, including proper accounting for HUD's sales proceeds."

As a result of defaults on Federal Housing Authority ("FHA") insured loans, HUD acquires title to a sizeable inventory of single-family homes. Until 2004, Management and Marketing ("M & M") services for this inventory of single-family homes, covering eighteen contract areas, were provided to HUD under contracts with seven firms. On August 6, 2003, HUD issued an M & M solicitation for the reprocurement of these services. The Solicitation, No. R–OPC–22505, sought proposals for the award of twenty-four indefinite-quantity, indefinite-delivery, fixed-unit rate contracts for M & M services throughout the United States. One of the twenty-four contracts was to cover the area of Illinois and Indiana, which is a portion of the area covered by the incumbent contractor, GFR, under its 1999 contract.

Among the firms submitting M & M proposals for the Illinois and Indiana area were plaintiff and Harrington, Moran, Barksdale, Inc. ("HMBI"). On August 1, 2004, Contract C–ATL–01759, covering M & M services for Illinois and Indiana was awarded by HUD to HMBI. Transition work under the contract

by HMBI was to begin upon award. GFR's 1999 contract was extended through December 13, 2004, for the purpose of "transition out" activity. No property would be managed by HMBI prior to October 1, 2004. By letter, dated August 4, 2004, the contracting officer for Contract C–ATL–01759 provided a post-award briefing to Chapman indicating the conclusion that HMBI offered the best value to the government.

On August 16, 2004, Chapman filed a protest with the GAO contesting the contract awarded to HMBI, and upon notification of the protest, HUD suspended work under the contract.

On August 31, 2004, the HUD Chief Procurement Officer recorded her "Determination and Findings of Head of the Contract Activity to Override Stay of Performance." The Chief Procurement Officer determined " ... that there exist urgent and compelling circumstances that significantly affect the interest of the United States and it is in the best interests of the United States to continue HMBI's performance. Accordingly, I hereby authorize continued performance under Contract C–ATL–01759 notwithstanding the protest, in accordance with the provisions of FAR Part 33.104(c)(2)."

The facts cited to support the override determination center on a demonstration program, the Chicago Homeownership Rehabilitation Initiative Program Agreement signed by HUD and the City of Chicago on April 26, 2004. The program provides for the purchase, over a two-year period, of some 125 single-family HUD residential properties, located in distressed and blighted areas of Chicago, by qualified Illinois nonprofit organizations. Those organizations will rehabilitate the properties aided by a repair report provided by the City of Chicago and then sell the rehabilitated properties to home buyers. The program was launched on September 1, 2004 and provisions in the HMBI Contract, such as a requirement that the M & M contractor submit a more extensive property condition report, were cited as needed to

---

**2.** To the extent that affidavits are considered, the record supplementation is sanctioned and is considered necessary for the resolution of this matter. *See Vantage Associates, Inc. v. United States,* 59 Fed.Cl. 1, 13 (2003).

support the Chicago program. Also cited is a provision in the HMBI Contract requiring testing for lead based paint which will be needed to the extent purchase money mortgages are utilized in the Program. The existing GFR Contract does not contain these provisions. The findings also indicate a need for a full-service Chicago area office which the HMBI Contract will require. In particular, the findings state that "[d]elaying contract performance as a result of the protest would result in a very confused implementation of this new program since two different contractors would then administer it." Finally, the findings make general reference to slower sales and deterioration of properties if GFR were to continue with performance during the GAO protest period.

On September 8, 2004, plaintiff filed its complaint seeking injunctive and declaratory relief overturning HUD's August 31, 2004, override determination.

### *Discussion*

Jurisdiction to review an agency's override of the Competition in Contracting Act ("CICA") automatic stay provision is governed by 28 U.S.C. § 1491(b)(1). *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286 (Fed.Cir.1999). This extends both to 31 U.S.C. § 3553(d)(3)(C) determinations premised upon asserted "best interests of the United States" as well as those based upon asserted "urgent and compelling circumstances that significantly affect interests of the United States." *PGBA, LLC v. United States,* 57 Fed.Cl. 655, 659 (2003); *Sierra Military Health Servs., Inc. v. United States,* 58 Fed.Cl. 573, 579 (2003); *Altos Fed. Group, Inc. v. United States,* 60 Fed.Cl. 832 (2004).

Upon review, the issue that must be resolved is whether there exists a rational basis for the HUD override determination. This is the review standard established by 28 U.S.C. § 1491(b)(4). *Sierra,* 58 Fed.Cl. at 579. It is not necessary to decide whether the record would support injunctive relief to stay contract performance by HMBI, pending resolution of a contract award protest. This would be relevant only had Chapman filed its protest action before this court rather than before GAO. Undoubtedly, the fact that the

Competition in Contracting Act ("CICA") provides an automatic contract performance stay, upon the filing of a protest before the GAO, is a factor which contributes to the decision to file a protest there. No prior justification for the stay is required, unlike the situation that would prevail were the protest filed in this court. *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir. 1993); *OAO Corp. v. United States,* 49 Fed. Cl. 478, 480 (2001). However, the automatic stay of contract performance during the GAO protest period can be negated upon a written finding by the head of the procuring activity involved that:

> **(I)** performance of the contract is in the best interests of the United States; or
>
> **(II)** urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; ...

31 U.S.C. § 3553(d)(3)(C).

Plaintiff asserts that the HUD override determination lacks validity under the applicable review standard. The determination of urgent and compelling circumstances and best interests of the United States that are utilized to authorize contract performance by HMBI are keyed to aspects of the new HMBI Contract which are not present in the incumbent contract held by GFR. Normally the fact that a new contract is better than an old contract would not constitute a valid basis for an override decision. *PGBA, LLC,* 57 Fed.Cl. at 663. However HUD cites specific new contract provisions needed for the Chicago Homeownership Rehabilitation Initiative Program and indicates that continuation of the GFR Contract without these provisions would interfere with the launching of this important endeavor. Plaintiff disputes HUD's contentions in this regard.

Initially, it must be noted that the new HMBI Contract covers Illinois and Indiana and the existing GFR Contract, which remains in effect through December 13, 2004, to permit transition, covers Illinois, Indiana, Kentucky and Tennessee. The override determination is based almost entirely on the

Homeownership Program located only in Chicago which plaintiff indicates initially will involve only some ten properties.

With respect to the new contract provisions needed for the Chicago Project, the HUD determination points to the expanded property condition report required by the HMBI Contract. HUD indicates that it has informed the City of Chicago that this report will be made available for each property selected to assist in the preparation of the "repair plan" the City must develop for each property sold to a nonprofit organization under the program. Plaintiff has submitted a declaration of Lionel Hotard, Vice President of GFR, stating that the report in question "is a system check completed prior to the appraisal upon acquisition of a property that involves filling out a new form. GFR already inspects each property upon acquisition, and has a copy of the new form. This is a service that GFR is fully capable of performing." The GFR Contract includes a "changes" clause which would authorize HUD to add a new service, if filling out an expanded form would be a new service, and provide an equitable adjustment to cover the cost. The override determination provides no analysis as to what the possible cost would be to provide expanded property condition reports on the limited number of properties to be selected for the Chicago Program during the GAO protest period which is scheduled to end on November 23, 2004. Based upon GFR's ability to provide this service and willingness to do so, any need for expanded property condition reports on several properties in Chicago cannot rationally form the basis for an urgent and compelling circumstance and best interests of the United States determination to authorize performance of the new HMBI Contract which covers all of Illinois and Indiana.

The provision in the new HMBI Contract for Lead–Based Paint Testing and Abatement ("LBP") is also cited as supporting the HUD override decision, in that this service will be required for any Chicago Project property to be covered by a Purchase Money Mortgage during the rehabilitation and resale period. The record shows that HUD contemplated adding the LBP Program to GFR's contract in 2001 and received a proposal _____. HUD did not add the service at that time and the issue remained pending. The record does show that under another area M & M contract covering Philadelphia, Pa., GFR has administered the HUD LBP Program for some 2,200 homes and has gained substantial experience in this regard. The HUD override determination and the administrative record do not demonstrate any analysis of the cost of adding the LBP Program to GFR's existing contract solely for the limited number of properties selected for the Chicago Project during the GAO protest period. Based on the record, which shows a delay in implementing LBP for the contract area from 2001 to 2004, and the ability and willingness of GFR to perform this service, the need for this lead testing and abatement for any Chicago Project property selected cannot rationally form the basis for the override determination which covers the area of Illinois and Indiana. This is clearly not an urgent and compelling circumstance when the matter has been pending for over three years and the best interests of the United States cannot rationally be determined absent full consideration of alternative approaches and the cost involved, such as adding the limited work needed for the launching of the Chicago Project to the incumbent's contract, which remains in effect until December 13, 2004.

Another provision in the new HMBI Contract which the HUD override determination cites is the requirement for a contract area office within the contract area. The HUD determination states that GFR operates out of its Irvine, California Office. Defendant also cites comments from HUD field offices that indicate GFR has plans to lay-off personnel during the transition period. Plaintiff, however, presents Mr. Hotard's declaration which states that GFR has a large office in Chicago with approximately forty-five employees and a team in place so that "GFR is fully capable of continuing indefinitely to perform Management and Marketing operations for Illinois and Indiana with the same levels of professionalism and dedication as it has in the past." Mr. Hotard also disputes that continued GFR performance during the GAO protest period would impact property main-

tenance standards noting that GFR's scores in this regard were in the acceptable range for HUD and "GFR has not received any notice from HUD expressing concern about its property maintenance in recent years." Mr. Hotard states that between August 2003 and August 2004, GFR's performance under the incumbent contract resulted in a reduction of the inventory of HUD-owned homes in the contract area from approximately 4922 to 3654—a decrease in excess of 25%.

While not expressly cited in the HUD override determination, the declaration of Joseph McCloskey, HUD Acting Deputy Assistant Secretary for Single Family Housing, submitted by defendant, asserts that continued performance by GFR during the GAO protest period would cause a monetary loss to HUD if the "new" services were added. Mr. McCloskey notes that for a house valued at $100,000, GFR charges HUD _____ for current services while the HMBI Contract will cost HUD _____, which includes the "new" services. Mr. Hotard responds that over the past six months the average net sales price (the number used for fee calculation) for a property in the Illinois and Indiana area was _____. Using this figure, GFR's fee under the incumbent contract would be approximately _____ per home and HMBI's fee under the new contract would be approximately _____ per home. The record does not support a finding that, from a financial standpoint, continued performance by HMBI would be in the best interests of the United States. It could well be true that any limited additional cost of adding whatever "new" services are needed for the Chicago Project property, to support the launch of the Chicago Project, would be more than offset by fee savings due to continued GFR performance in the area covered by its current contract.

Finally, the HUD override determination rests heavily upon the conclusion that HUD's relations with the City of Chicago will be adversely impacted by having two contractors involved. The determination states that HMBI has met with the City personnel and confusion will occur with respect to the Chicago Project if GFR were to continue with performance of the incumbent contract because of the operation of the stay imposed during the GAO protest period. However, the HUD override determination reflects no consideration of the confusion and cost involved if HMBI continues performance but the GAO were to sustain Chapman's protest. If termination of the award to HMBI were required, what would the cost be for the termination settlement? *PGBA, LLC,* 57 Fed.Cl. at 662. Would the confusion in that circumstance, after HMBI performance during the protest period, exceed that involved in having GFR continue performance until the protest is resolved? The HUD determination and the record are silent on these relevant considerations. GFR claims to have long established relationships with the City of Chicago personnel responsible for the Homeownership Project, so the issue of potential confusion is far from clear and the record contains no supporting evidence in this regard. *See Sierra,* 58 Fed.Cl. at 580.

### Conclusion

Given the ability and willingness of the incumbent contractor to continue to perform M & M services for Illinois and Indiana under its existing contract, which has been extended through December 13, 2004, together with any added services which HUD deems necessary for the launch of the Chicago Homeownership Rehabilitation Program, it is concluded that the HUD override determination of August 31, 2004, lacks a rational basis on the record submitted as supplemented. The situations cited do not present urgent and compelling circumstances in that all of the required services can efficiently be obtained without performance of the new contract during the GAO protest period. The record also lacks the objective analysis required to support a determination that performance of the new contract is in the best interests of the United States. HUD's override determination is based almost entirely on the performance of a limited aspect of the contract in a limited portion of the contract area, and no relevant or substantial adverse financial or administrative impact has been established from continuation of a stay during the GAO protest period.

Accordingly, it is **ORDERED:**

(1) The plaintiff's motion for judgment on the record shall be **GRANTED** to the extent that judgment shall be entered declaring the HUD Determination, dated August 31, 2004, to be invalid and of no effect with the result that the stay provided by 31 U.S.C. § 3553(d)(3)(A) remains in effect;

(2) Plaintiff's motions for injunctive relief shall be **DENIED** as moot;

(3) Defendant's motion for judgment on the record shall be **DENIED**;

(4) No costs shall be assessed.

(5) On or before October 8, 2004, counsel shall transmit, preferably by facsimile, a redacted copy(ies) of this Opinion to chambers, striking-out any proprietary information, so that a redacted version may be prepared and placed in the public record.