**ALION SCIENCE AND TECHNOLOGY CORP., Plaintiff,**

v.

**UNITED STATES OF AMERICA, Defendant,**

and

**Advanced Engineering and Sciences, a division of ITT Industries, Inc., Intervenor.**

No. 05–1072 C.

United States Court of Federal Claims.

Filed Under Seal: Nov. 2, 2005.

Reissued: Nov. 29, 2005 [1].

1. This opinion originally was issued under seal on November 2, 2005. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication, and a status conference was conducted on November 29, 2005 to discuss proposed redactions. Accordingly, the opinion is herein reissued for publication, unsealed, with only minor alterations to account for redactions.

L. James D'Agostino and Richard Moorhouse, Greenberg Traurig, LLP, McLean, Virginia, for plaintiff.

J. Reid Prouty, U.S. Department of Justice and Flayo Kirk, Defense Information Systems Agency, Washington, DC, for defendant.

Thomas C. Papson, Jason N. Workmaster, and Kara M. Klaas, McKenna Long & Aldridge LLP, Washington, DC, for intervenor.

## OPINION AND ORDER

BLOCK, Judge.

On October 7, 2005, plaintiff, Alion Science and Technology Corporation ("Alion"), brought an action to enjoin defendant, the Defense Information System Agency ("DISA"), from proceeding with the performance of a contract for electromagnetic spectrum engineering services awarded to intervenor-defendant, Advanced Engineering and Sciences ("AES"), a division of ITT Industries, Inc. Plaintiff had previously filed a post-award bid protest with the Government Accountability Office ("GAO"), triggering the automatic stay of contract performance imposed by the Competition in Contracting Act ("CICA"). *See* 31 U.S.C. § 3553 (2002). During the pendency of that protest, however, DISA exercised an "override" of the stay and authorized continued contract perform-

ance by AES. It is the "override" that plaintiff challenges here.

As described in greater detail below, the court concludes that plaintiff is not entitled to equitable relief because it has not demonstrated that defendant's decision to override the stay was arbitrary or capricious.

## I. Introduction

Recent operations in Afghanistan demonstrate how information technology is fundamentally changing the way the U.S. military conducts its operations. U.S. Special Forces—despite riding mules and donkeys—have routinely deployed space-age communication devices to signal aircraft that, in turn, drop "smart bombs" on Taliban and Al Qaeda targets with pin-point accuracy.

One of the primary focuses of this fundamental transformation within the military has been a deliberate move towards what it calls "network-centric warfare" ("NCW"). NCW represents the military's bold progression into the information age, in which "power is increasingly derived from information sharing, information access, and speed, all of which are facilitated by networked forces."[2]

With this increased reliance on information technology in war fighting, the U.S. military has developed a nearly insatiable appetite for emerging communications technology that links all levels of the command and intelligence structures with the warfighter. One of the side effects of an increasing dependence on communications technology, however, is an attendant need for a range of electromagnetic spectrum[3] dedicated to military use that enables the military's "wireless" communications capabilities. Department of Defense Directive 4650.1, Enc. 2 at ¶ E2.1.8. (June 8, 2004).

One limitation on the military's ability to continue its integration of NCW and spec-

---

**2.** The Implementation of Network–Centric Warfare at I, Department of Defense, Office of Force Transformation, *available at* http://www.oft.osd.mil/library/library_files/document_387_NCW_Book_LowRes.pdf.

**3.** By way of brief background, the Department of Defense defines the electromagnetic spectrum as the "range of frequencies of [electromagnetic]

radiation that has been allocated for specified services under the U.S. and international tables of frequency allocation, together with the EM spectrum outside the allocated frequency range where the use of unallocated frequencies could cause harmful interference with the operation of any services within the allocated frequency range." Dep't of Defense Directive No. 4650.1 at Enc. 2 (June 8, 2004), *available at* www.dtic.mil/whs/directives/corres/pdf2/d46501p.pdf.

trum-dependent systems is the availability of allocated electromagnetic spectrum. Spectrum is a "critical, finite national resource" that the Department of Defense ("DOD") has determined is "vital to the support of military operations." *Id.* at 2. Competition from both commercial communication applications and foreign military needs places strain on the range of available, allocable spectrum and requires that the DOD be vigilant to not only protect its existing allocation of spectrum, but also to accommodate future needs by acquiring a broader spectrum allocation and coordinating long-term spectrum management policies in concert with emerging spectrum-dependent technologies.

As far as spectrum allocation is concerned, the DOD's share is largely dependent on decisions before dedicated international bodies and is subject to bilateral negotiations. *Id.* at 3. One of the primary international bodies is the International Telecommunication Union ("ITU"), an organization within the United Nations System that provides a forum where governments and the private sector coordinate global telecommunication networks and services. *See* http://www.itu.int/home/index.html. Between October 15 and November 9, 2007, the ITU will host a major World Radio Communication Conference ("WRC") that the DOD has identified as a critical forum to preserve and advance DOD spectrum allocation needs. *See* DOD Directive 4650.1 at 4. The DOD has also identified the importance of "related national, regional, and international preparatory activities" that are all precursors to the WRC and similar international fora. *Id.*

To ensure that adequate spectrum remains available for the military, the DOD has directed the Assistant Secretary of Defense for Networks and Information Integration to ensure DOD's spectrum needs are met and its allocated spectrum is used efficiently. In March 2004, as part of this directive, the DOD, through DISA and the Defense Spectrum Office ("DSO"), solicited proposals for spectrum management engineering services. *See* Admin. Rec. ("AR") at 81 (Solicitation No. HC1047–05–R–4018) and 95 (Solicitation Statement of Objectives). It is the contract

award from this solicitation that gives·rise to the instant litigation.

Alion submitted a proposal under the solicitation on April 14, 2005. AR at 2–3 (Determination and Findings). On September 27, 2005, Alion was notified by DISA that it was not the successful bidder for the contract. *Id.* at 4. The next day Alion received its written debriefing and learned that AES had been awarded the contract. *Id.*

On September 30, Alion timely filed a bid protest with the GAO challenging the award to AES on the grounds that AES has a material organizational conflict of interest that cannot be mitigated. *Id.* at 4. Pursuant to the CICA, the GAO has 100 days to issue its decision on Alion's bid protest; that decision is due by January 9, 2006. *See* 31 U.S.C. § 3553 (2002). Once a timely post-award bid protest is filed with the GAO, CICA imposes a statutory stay of contract performance pending the resolution of the protest. *Id.* at § 3553(d). Notwithstanding the statutory stay that went into effect on September 30 when Alion filed its GAO bid protest, DISA informed GAO in writing on October 5, 2005, that continued contract performance was required and authorized pursuant to CICA's two alternative criteria for "overriding" the automatic stay: (1) the "best interests of the United States" required continued performance of the contract, and (2) "urgent and compelling circumstances significantly affecting the interests of the United States" would not permit waiting for the GAO's decision in Alion's bid protest. 31 U.S.C. § 3553(d)(3)(c); 48 C.F.R. § 33.104. Accordingly, DISA exercised the override of the statutory stay provisions and authorized AES to perform under the contract despite Alion's pending bid protest. Compl. at 5.

After DISA exercised the override of the CICA stay provisions, Alion sued in this court on October 7, 2005, for injunctive relief to enjoin the agency from continuing performance of the contract, pending the outcome of Alion's underlying bid protest with the GAO. Compl. at 6. The complaint was accompanied by an application for a temporary restraining order and a motion for a preliminary injunction. That same day the

court conducted a telephone status conference with the parties and AES, as potential intervenor, to determine a course of action and evaluate the need for a temporary restraining order. At that time, the court granted AES's motion to intervene and the government offered to suspend the receipt of any of AES's work-product under the contract until this court could issue its opinion on DISA's decision to override the CICA stay. Ostensibly, that concession would temporarily mitigate any potential conflicts of interest that Alion perceived. On Wednesday, October 12, the government filed the administrative record and the court granted plaintiff leave to supplement the record on Monday, October 17. On Tuesday, October 18, the parties filed cross-motions for judgment on the administrative record under RCFC 56.1 and responses were filed two days later. A hearing on the respective motions was promptly conducted on Friday, October 21, 2005.

At the hearing the court concluded that judgment on the administrative record in favor of the government– and intervenor-defendants was appropriate. The court therefore denied plaintiff's motions for equitable relief and judgment on the administrative record but granted the government and intervenor's corresponding Rule 56.1 motions. The court's opinion follows, first with a brief overview of the CICA stay in a GAO bid protest and the requirements for an override determination, followed by the court's Rule 56.1 findings of fact based on the administrative record as they relate to DISA's decision to override the CICA stay, and finally the court's analysis of DISA's decision.

## II. Bid Protests, the Automatic Stay and Override Decisions under CICA

According to the applicable provision of CICA, the award of a contract (in the case of a pre-award bid protest) or the performance of an awarded contract (in the case of a post-award bid protest) must be stayed if a bid protest is filed with the GAO during the procurement period or within ten days of the award of the contract (or within five days of a required debriefing, whichever is later). 31 U.S.C. § 3553(c), (d). Notwithstanding this statutory stay, in extraordinary circumstances the procuring agency may override the stay and either award the contract or authorize performance.

If the bid protest is filed during the procurement period (and is thus a "pre-award" bid protest), a procuring agency may exercise the override and "authorize the *award* of the contract" by providing a "written finding that *urgent and compelling* circumstances which significantly affect interest of the United States will not permit waiting" for the GAO's decision on the bid protest. 31 U.S.C. § 3553(c)(2) (emphasis added). If the protest is timely filed after the award of the contract, the procuring agency may "authorize the *performance* of the contract" upon a written finding that *either* "performance of the contract is in the best interests of the United States" *or* "urgent and compelling circumstances that significantly affect interests of the United States" will not permit waiting for the GAO's decision. 31 U.S.C. § 3553(d)(3)(C)(I).

As this court noted with respect to overrides in the post-award bid protest context, the "best interests of the United States" justification is somewhat more amorphous than the "urgent and compelling circumstances" justification. The "best interests" exception may provide agency officials with "a lower standard for overriding a stay," because there are fewer restrictions on the type of circumstances required to justify the override (*i.e.*, what is in the "best interests" need not always rise to an "urgent or compelling" circumstance, though this court can anticipate very few circumstances in which an override might be in the best interests of the United States but *not* involve urgent and compelling circumstances). *See Spherix, Inc. v. United States*, 62 Fed.Cl. 497, 505, 507 (2004) ("[T]he agency head can elect to make the unremarkable determination that contract performance is in the best interests of the United States."). Nevertheless, the required justification to exercise the override in a "best interest" scenario is "not *de minimis*," the "statutory presumption still is that the stay should remain in place and the override occur only if valid justification is shown." *Id.* n. 8. To be sure, as discussed thoroughly below, the agency official is not

free to exercise wanton discretion; the CICA provisions explicitly require written findings justifying the decision that the override is, in fact, in the best interests of the United States.

### III. Findings of Fact Based on the Administrative Record Regarding DISA's Override of the CICA Stay

As it must in resolving a Rule 56.1 motion, the court begins with the following findings of fact based on the administrative record. *See* RCFC 56.1; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354–56 (Fed.Cir. 2005).

It is the policy of the DOD to aggressively pursue spectrum management strategic goals and objectives, which in essence means that the military must develop policies to acquire and effectively use the available electro-magnetic spectrum. AR at 296. In June 2004, the DOD issued DOD Directive 4650.1 which charged the Assistant Secretary of Defense for Network and Information Integration with ensuring that "DOD spectrum needs are met and that the Department is making the most efficient and effective use if available spectrum." *Id.* at 293; *see also* Dep't of Defense Directive No. 4650.1.[4]

On August 24, 2004, Alion entered into contract SP0700–99–D–0301/0033–061 with DISA "to provide engineering research and analysis support." AR at 299. The services contemplated and provided under the contract generally required Alion to survey technological developments and report back to DSO on those developments and how they might impact spectrum management policies. The services were more "monitoring and 'note-taking' than sophisticated systems engineering and technical analysis in support of policy development." *Id.* at 293. Specific statements of work under Alion's contract required it to, among others:

- Conduct research, survey and review of emerging technology;
- Research, develop, document and support implementation of a revised DoD spectrum supportability;

- Conduct a continuous, detailed survey, research and review of activities and trends in national and international government and non-government spectrum management policies, procedures and plans;
- Research and review for technical adequacy contributions submitted by national or international sources; and
- Attend international and national forums on international spectrum matters to present and defend coordinated positions established by the Department of Defense and/or the U.S. Government.

*Id.* at 300. Agency officials were pleased with Alion's performance. *Id.* at 293. In addition to Alion, DSO contracted with another company, SY Coleman Corporation, to provide similar services. *Id.* at 304. Similarly, Scitor Corporation had a contract with the Army Spectrum Management Office to perform similar work. *Id.* at 317.

To this point, DSO's role had been largely limited to "technology roadmapping and assessment of technological innovation," under which DSO strove to stay abreast of developments in the field. *Id.* at 96. Subsequently, however, DSO began to experience a sea-change in the way it approached its spectrum management responsibilities. Its new mission envisioned "hands-on implementation of the roadmap" to proactively develop and assert DOD's spectrum allocation and management policies. *Id.* at 97. As a consequence of this new, proactive approach to spectrum management in which DSO was to be the driving force behind DOD spectrum policies, DSO required new services from its contractors. The contractors' work needed to shift from tracking and assessing technology innovation to conducting detailed spectrum engineering analysis to support DOD policy development. *Id.* at 296. Initially, DSO hoped to obtain this level of effort from its existing contractors, including Alion. *Id.* at 293. The record shows that the level of desired technical analysis never materialized from any one of DSO's existing individual contractors, however, and DSO needed to initiate a

---

4. Although not included in the administrative record, this DOD Directive is routinely cross-referenced in the administrative record and is available publicly at www.dtic.mil/whs/directives/corres/pdf2/d46501p.pdf.

new procurement for these broader-scope services. *Id.* at 293–94.

DISA issued a solicitation for new spectrum engineering services on March 15, 2005. *Id.* at 81. The background statement of the solicitation noted the shift in needed work:

> The DSO mission requirements have changed from technology roadmapping and assessment of technological innovation into hands-on implementation of the roadmap. To achieve these new mission activities/requirements, the DSO requires an innovative and technically capable contractor team that understands state-of-the-art technology and had readily available radio-frequency (RF) systems engineers that can be matrixed into DSO activities.

*Id.* at 96. The shift in the type of work expected from the contractor was set out in the solicitation's description of the scope of the work: "The DSO requires system engineering support where engineers and analysts are required to perform tasks ranging from developing positions, policies, guidance to define and build a comprehensive DOD spectrum management architecture." *Id.*

Specifically, the DSO sought system engineer support for its policy development functions, requiring the contractor to:

- Perform technical studies and modeling to develop long-term spectrum allocation strategies;
- Devise long-term plans and strategies based on regulatory activities to foster development of DOD policies;
- Advocate and lead all DOD national/international outreach efforts including ITU activities;
- Develop and integrate spectrum technologies;
- Develop recommendations for policies, strategies, regulations and procedures to support integration of emerging technologies; and
- Devise DOD spectrum management architecture.

*Id.* As the solicitation's Statement of Objectives indicated, DSO expected the contractor under this solicitation to provide more analytic, policy development work than had been expected of Alion and SY Coleman Corpora-

tion under the earlier contracts, and more international operations than asked of Scitor Corporation. *See* AR at 298–303, 304–14, 317–33.

The solicitation also made clear that one key aspect of the expected services would deal with international spectrum allocation issues. Specifically, the contractor would be expected to assist DSO to become the focal point and expert within the DOD for (1) development of National/International spectrum allocation and (2) preparation activities for the WRC. *Id.*

The solicitation also required a transition plan which would indicate how the contractor planned to "ramp up" as the contract began. *Id.* at 118. Specifically, the government viewed a well-staffed start-up team and on-site support as important elements to ensure DSO's operations were not interrupted. *Id.* at 6.

Among the reasons for the importance of a strong start-up team were the numerous national and international spectrum meetings scheduled between September and December 2005, the first four months of the contract base period. During that period, several working groups and committees were scheduled to meet that were discussing WRC agenda items that DOD assessed as being of "high concern." *Id.* at 208. All told, nineteen ITU meetings were scheduled during the September to December 2005 period. *Id.* at 221.

In addition to international forums, the domestic travel schedule for DSO's "National Team," which would include contract personnel, indicated that six meetings were scheduled during the September to December 2005 period. *Id.* at 288–89. Of these six meetings, four were designated as "Mission Critical (can't accomplish the mission without it)" and the other two were designated "Mission Essential (has a significant, impact on the teams's ability to accomplish the mission)." *Id.*

As noted above, both Alion and AES submitted proposals under the solicitation; they were the only two offerors. *Id.* at 5. AES's proposal was selected over Alion's in part due to perceived risks in Alion's technical

capabilities and projected staffing. *Id.* at 10. Alion subsequently filed its post-award bid protest with the GAO, triggering the CICA statutory stay of any further performance under the contract by AES pending GAO's decision.

Thereafter, on October 5, 2005, in response to the CICA stay, Michael Geist, Chief of the Procurement Management Division for DISA, issued the Determination and Findings ("D & F") authorizing continued contract performance by AES notwithstanding Alion's protest to GAO. *Id.* at 2; *see* 48 C.F.R. § 22.104(c)(2) (2005). In the D & F, Mr. Geist made the dual determination that: (1) performance of the contract would be in the best interests of the United States, and (2) urgent and compelling circumstances significantly affecting the interests of the United States would not permit waiting for the GAO's decision on Alion's protest in January, 2006. AR at 4.

The D & F determination was based on the fact that the contract was for "new work" and would provide DSO with engineering support services that would improve DSO's mission effectiveness by developing strategies, plans and policies supporting spectrum allocation and technology. *Id.* at 2–3. The D & F set out two findings detailing why continued performance under the contract was imperative. The first was that the period between September and December 2005 was "time-critical," with an immediate need for qualified personnel. *Id.* at 4. The second was that during this "time-critical" period, AES–ITT was the only source with qualified personnel which DSO could use to perform the work described in the contract. *Id.* at 3–4.

After DISA exercised the override of the CICA stay provisions, Alion sued in this court on October 7, 2005, for injunctive relief to enjoin the agency from continuing performance of the contract, pending the outcome of Alion's underlying bid protest with the GAO. Compl. at 6.

## IV. Discussion

### A. Jurisdiction and Standard of Review

This court has jurisdiction to review an agency's override decision under 28 U.S.C. § 1491(b). *See RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289–91 (Fed.Cir.1999); *see also PGBA, LLC v. United States,* 57 Fed.Cl. 655, 658–59 (2003).

### 1. Rule 56.1 Versus Summary Judgment

A Rule 56.1 motion, styled as a "Review of Decision on the Basis of Administrative Record" by this court's rules, requires the court to weigh the evidence presented in the administrative record and make attendant findings of fact. Although some courts have cited Rule 56.1 and its procedural posture as an analogue to Rule 56 and summary judgment procedures—in part because Rule 56.1 itself indicates that "Rule 56(a)-(b) applies," *see, e.g., Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1352–53 (Fed. Cir.2004) (dicta)—the fact of the matter is that the two are really quite different procedural approaches to judgment and require the court to engage in very distinct inquiries. *See generally Bannum,* 404 F.3d at 1354–56. As the Federal Circuit recently clarified in *Bannum,* a Rule 56.1 motion requires "a different standard of review" than does a motion for summary judgment and it does not embrace the "Rule 56 burden-shifting and presumptions" that inhere to the summary judgment inquiry. *Id.* at 1355.

Instead, Rule 56.1 is designed to "provide for trial on a paper record, allowing fact-finding by the trial court" based on the administrative record filed by the agency. *Id.* at 1356. Essentially, in those types of agency review cases designed to be evaluated exclusively on the record, such as bid protests and CICA overrides, "judgment on the administrative record is properly understood as intending to provide for an expedited trial on the record." *Id.* Accordingly, the parties are to mount their case and make their arguments based upon the documentary evidence that comprises the administrative record, as supplemented pursuant to Rule 56.1(a). Based upon that record, the court must make appropriate findings of fact and reach the merits of the case. *Id.*

In this case, plaintiff's complaint was accompanied by a motion for a preliminary injunction essentially seeking to bar the gov-

ernment from continuing to override the stay, pending GAO's resolution of the underlying bid protest. In the traditional preliminary injunction proceeding, the court must resolve the request for temporary or preliminary equitable relief on an expedited basis, before it has the opportunity to resolve the merits of the case. As a result, the court's traditional preliminary injunction analysis involves an analysis of the moving party's "*likelihood* of success on the merits." *See, e.g., PGBA,* 57 Fed.Cl. at 656 ("In order to obtain a preliminary injunction, plaintiff must demonstrate: (i) a likelihood of success on the merits; (ii) the harm to plaintiff outweighs the harm to government; (iii) the public interest is served by enjoining government; and (iv) irreparable injury to plaintiff if government is not enjoined, including, but not limited to, the absence of an adequate remedy at law.") (citation omitted). In those situations, the four injunction "factors" are treated as a balancing test based on the relative weight of each factor. *Id.*

Here, however, since the court has the opportunity to enter judgment under the framework of Rule 56.1, the inquiry subsumes any analysis of the plaintiff's success on the merits, let alone a *likelihood* of success on the merits. This consolidation of the preliminary injunction with a determination on the merits is what is contemplated in the court's Rule 65. RCFC 65(a)(2) ("Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing on the application."). Accordingly, if the court enters judgment on the record against a plaintiff seeking equitable relief—as the court does here—the need to evaluate the injunction factors is rendered moot.

### 2. The Standard of Review for a CICA Override Decision

■ As for the merits of the override decision, this court reviews the contracting agency's decisions to override the stay under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), which are incorporated by reference into this court's jurisdictional authority. 28 U.S.C.

§ 1491(b)(4) ("In any action under this subsection [*i.e.,* in connection with a bid protest], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see PGBA,* 57 Fed.Cl. at 657. As the Supreme Court has noted, this standard of review:

> requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although *this inquiry into the facts is to be searching and careful,* the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (emphasis added) (citations omitted). As this court has noted, "[b]y its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" *PGBA,* 57 Fed.Cl. at 657 (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

The "searching and careful" inquiry that the court must make, *see Overton Park,* 401 U.S. at 416, 91 S.Ct. 814, is more than a glancing inquiry into the facial reasonableness of the agency's stated rationale. Instead, the Supreme Court has instructed that the court look closely to all the facts inherent in the record to determine if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Accordingly, even if the agency's stated rationale seems reasonable or persuasive, it must also be supported by the actual facts in the record.

### 3. The "Best Interests of the United States" Determination Is Reviewable in This Court

Here, the government raises the argument that a procuring agency's determination under § 3553(d)(3)(C)(i)(I)—that an override of the CICA stay is "in the best interests of the United States"—is not subject to review by a court, except under an extremely deferential standard.[5] *See* Def.'s Cross–Mot. for J. on the Admin. Rec. at 6–9. This argument is based primarily on the government's adoption of the rationale of an old (and this court believes outdated) case from the District Court of the District of Columbia. *See* Def.'s Cross–Mot. for J. on the Admin. Rec. at 8 (citing *Topgallant Group, Inc. v. United States,* 704 F.Supp. 265 (D.D.C.1988)). In *Topgallant,* the district court concluded that a "best interests" determination was of the type "committed to agency discretion by law" and "traditionally exempt from judicial review." *Id.* at 266. The court relied in principal part on two Supreme Court cases, *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) and *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The *Topgallant* court indicated that judicial review of such decisions may only be had under an extremely deferential standard, namely if the plaintiff can demonstrate "gross impropriety, bad faith, fraud, or conscious wrong doing." *Topgallant,* 704 F.Supp. at 266.

In *Webster,* the Supreme Court noted that for agency actions reviewed under the APA, including § 701(a)(2), judicial review might not be had "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster,* 486 U.S. at 599–600,

108 S.Ct. 2047 (citing *Heckler,* 470 U.S. at 830, 105 S.Ct. 1649). The *Webster* Court applied this concept to a statute that granted the Director of the Central Intelligence Agency ("CIA") authority to terminate an employee whenever the Director "shall *deem* such termination necessary or advisable in the interests of the United States." *Id.* (citing 50 U.S.C. § 403(c)) (emphasis in original). The Court emphasized that the statute permitted a termination whenever the Director *"deemed"* that action appropriate, and "not simply when the dismissal *is* necessary or advisable to those interests." *Id.* (emphasis in original). The Court concluded that "[t]his standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review." *Id.*

Almost without exception, this court has either declined to adopt the rationale of *Topgallant* or reviewed a "best interests" determination under § 706(2)(A) without a discussion of that decision. *See PGBA,* 57 Fed.Cl. at 659–60 (analyzing government's *Topgallant* argument and concluding "that there are standards by which to review the 'best interest' finding"); *Chapman Law Firm Co. v. United States,* 67 Fed.Cl. 188 (2005) (reviewing a "best interests" determination under the § 706(2)(A) standard without discussion of whether that decision is committed to agency discretion, citing *Spherix, Inc. v. United States*); *Spherix, Inc. v. United States,* 62 Fed.Cl. 497, 503–04 (2004) (following *PGBA* and applying the § 706(2)(A) standards); *Chapman Law Firm Co. v. United States,* 62 Fed.Cl. 464, 466 (2004) (following *PGBA* and applying § 706(2)(A) standards to a "best interests" determination); *Altos Fed. Group, Inc. v. United States,* 60 Fed.Cl. 832, 833–34 (citing *PGBA* and applying § 706(2)(A) standards to "best interests" determination); *Filtration Dev't Co. v. United States,* 59 Fed.Cl. 658, 663–64 (2004) (reviewing an "urgent and compelling circumstances" determination, but acknowledging *PGBA* and noting that court's decision was

---

**5.** As noted below, the government's argument has not been received warmly by this court in other cases. Nonetheless, the government continues to litigate this issue frequently because, as counsel noted during the hearing, the Federal Circuit has not yet ruled directly on the issue. *See* Hearing Tr. at 4–5.

"consistent" with *PGBA's* conclusion that a "best interests" determination is reviewable under § 706(2)(A) standards); *Sierra Mil. Health Servs., Inc. v. United States,* 58 Fed. Cl. 573, 579 (2003) ("The analysis in *PGBA* [that a "best interests" determination is reviewable] is convincing and this result is adopted here.").[6] Indeed, it does not appear that the rationale employed in *Topgallant* has been applied consistently by the District Court of the District of Columbia.[7]

The primary reason this court has rejected the government's position is the salient fact that Congress, eight years *after* the *Topgallant* decision, amended the Tucker Act, 28 U.S.C. § 1491, by passage and enactment of the Alternative Dispute Resolution Act of 1996 (ADRA). That legislation provided this court with sweeping jurisdiction over any "violation of a statute or regulation in connection with a procurement or a proposed procurement," and mandated review "pursuant to the [APA] standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(1), (b)(4) (2001). Clearly, the operative language "in connection with" a procurement is broad enough to include review of CICA override cases (with CICA's "public interest" and "urgent and compelling" justification criteria) under the arbitrary and capricious standard of § 706 of the APA, as incorporated through the ADRA.

This rationale was adopted by the Federal Circuit in *RAMCOR,* but the court had before it a *pre-award* case where only the "urgent and compelling circumstances" justification for the stay override could be in play pursuant to the CICA statute. *RAMCOR,* 185 F.3d 1286; 31 U.S.C. § 3553(c)(2). In *RAMCOR,* the court faced the government's assertion that the Court of Federal Claims improperly reviewed the agency override under the traditional administrative law arbitrary and capricious standard, of which Congress under the APA had conferred exclusive jurisdiction on the district courts. The Federal Circuit rejected this argument holding that this CICA override provision clearly was encompassed by the phrase "in connection with a procurement" contained in the ADRA, and, accordingly, CICA override cases fall within the Court of Federal Claim's jurisdiction. *RAMCOR,* 185 F.3d at 1288–89 ("As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."). And because the ADRA had explicitly imported the APA § 706 standards of review as the vehicle for the Court of Federal Claims' review of procurement cases, the Circuit further held that it was proper for the trial court to employ an arbitrary and capricious review. *Id.* at 1290; *see* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review

---

**6.** This court is familiar with only one decision in the Court of Federal Claims that arguably gave some credence to *Topgallant. See SDS Int'l, Inc. v. United States,* 55 Fed.Cl. 363, 364–65 (2003) (Futey, J.). Nonetheless, it does not appear that the court adopted *Topgallant's* rationale. The *SDS* court noted that courts have applied various standards to reviewing CICA override determinations, including *Topgallant's* "gross impropriety" standard and the § 706(2)(A) standard, and also noted that a "best interests" determination "has been held 'not susceptible to judicial review.'" *Id.* at 364 (citing *Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370, 1378 n. 1 (E.D.Va. 1993) (citing *Topgallant,* 704 F.Supp. at 266)). But in fact, the *SDS* court, in reviewing the procuring agency's "best interests" determination, concluded that the decision was entitled to deference *regardless of what standard of review applied. Id.* Significantly, Judge Futey at least implicitly rejected the *Topgallant* approach one year later in *Altos* by applying the § 706 standard to an override case examining the agency's justification of the public interest to continue the

performance of the contract. *See Altos,* 60 Fed. Cl. at 833.

**7.** While at least one subsequent case in the District Court of the District of Columbia cited *Topgallant* as persuasive authority, *see Found. Health Fed. Servs. v. United States,* 1993 WL 738426 at *4 (D.D.C. Sept.23, 1993), cases that preceded *Topgallant* had reviewed "best interests" CICA overrides under the arbitrary and capricious standard. *See Samson Tug & Barge Co. v. United States,* 695 F.Supp. 25 at 26–28 (D.D.C.1988) (concluding agency action was "arbitrary, capricious, and contrary to law" despite government's argument that a "best interests" determination could not be reviewed); *Burnside–Ott Aviation Training Center, Inc. v. Dep't of Navy,* 1988 WL 179796 at *2–3 (D.D.C.1988) (concluding that agency decision was reviewable, in part because the CICA requirement of "a written finding" was "an obvious mechanism to facilitate later review"). The Court of Appeals for the D.C. Circuit does not appear to have addressed this inconsistency.

the agency's decision pursuant to the standards set forth in section 706 of title 5.").

By equal force, then, the Federal Circuit's jurisdictional rationale must apply to *post*-award CICA override determinations predicated on either a "public interest" justification or an "urgent and compelling circumstances" determination, *see* 31 U.S.C. § 3553(d), because, they too are determinations made by an agency "in connection with a procurement." *See PGBA,* 57 Fed.Cl. at 658–59. Furthermore, as in the *PGBA* case, the government here provides precious little explanation for why a "best interests" determination should be committed to agency discretion and is not reviewable.[8] *See PGBA,* 57 Fed.Cl. at 660. To be sure, while the government strives to liken the CICA provisions at issue here with the statute considered in *Webster,* the CICA provisions authorizing the agency override are notably different from the provisions in *Webster* determined to be committed to agency discretion.

First, the CICA override provisions require written findings for both an "urgent and compelling circumstances" and a "best interests" override. "[T]he fact that both findings must be made in writing suggests that Congress intended further review." *Id.* (citing *Burnside–Ott Aviation Training Center, Inc. v. Department of Navy,* 1988 WL 179796 at *3 (D.C.Cir. Nov. 4, 1988)). Second, the CICA provisions on their face do not seem to commit nearly as much discretion to the agency official, alone, as the *Webster* provisions do. As noted above, the *Webster* provisions permitted the CIA Director to terminate an employee whenever he should "deem" that termination to be "necessary or advisable in the interests of the United States." *Webster,* 486 U.S. at 600, 108 S.Ct. 2047. In *Webster,* whether or not the Director's determination was indeed a fact was not of consequence; instead, the only determinative factor was whether the Director personally deemed those circumstances to exist. The Court explicitly acknowledged this distinction, noting that the statute did not call for dismissal "simply when the dismissal *is* necessary or advisable to those interests." *Id.* (emphasis in original).

This is in sharp contrast to the CICA provisions, which do not explicitly entrust the "urgent and compelling circumstances" or "best interests" determinations to any agency official's discretion. Instead, the statute requires that the override *actually be* in response to urgent and compelling circumstances or the best interests of the United States. Though perhaps involving a subjective element in the decision-making process, the decision itself is essentially an objective one. *See PGBA,* 57 Fed.Cl. at 655 ("To say that this court must defer to agency discretion, however, is not to say that a particular finding is totally committed to that discretion, so as to make it unreviewable.").

As a final matter, the court notes that the ADRA incorporated only the "standards set forth in section 706 of title 5." 28 U.S.C. § 1491. It did *not* adopt the APA *in toto* for review of agency actions in the procurement process. Specifically, the ADRA did not incorporate 5 U.S.C. § 701(a), which both the *Heckler* and *Webster* Courts looked to as the genesis for the "committed to agency discretion" analysis. *See* 5 U.S.C. § 701(a) (noting

8. At the hearing, the government raised for the first time a policy argument that it believed supports the *Topgallant* approach. In response to the court's question about why Congress would provide an agency *carte blanche* to override the stay and therefore abrogate the very "teeth" that the ADRA statutory stay was designed to impose, the government pointed to other systemic checks that weigh on an agency's decision to override the CICA stay on behalf of the "best interests" of the United States. *See* Hearing Tr. at 7–9 (Oct. 21, 2005). Pointing to 31 U.S.C. § 3554(b)(2), the government notes that if an agency overrides the CICA stay based on a "best interests" determination, it subjects the agency to a potentially more costly remediation in the event the protest-er's underlying bid protest is upheld by the GAO. This is because in those circumstances "the Comptroller General shall make recommendations [to promote compliance with procurement statutes and regulations] without regard to any cost or disruption from terminating, recompeting, or rewarding the contract." *Id.;* 31 U.S.C. § 3554(b)(2). On the other hand, if a protest is sustained by the GAO and an override based on "urgent and compelling circumstances" alone was exercised, then "the GAO takes into account the impact upon the agency when it issues its opinions and its rulings and tells the agency what to do" to remedy the impropriety. Hearing Tr. at 8.

that agency action is reviewable under the APA standards established in the Act unless "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law"). As noted in *Heckler*, for an *APA review* to obtain "a party must first clear the hurdle of § 701(a)." *Heckler*, 470 U.S. at 828, 105 S.Ct. 1649. By contrast, in reviewing an agency's procurement decision—not under the APA, but rather under the Court of Federal Claims' jurisdictional authority in 28 U.S.C. § 1491(b)—his court does not apply the APA *in toto* and its attendant § 701 provisions. Instead, the court merely employs the § 706 standards to review the agency action. Accordingly, the structure of 28 U.S.C. § 1491(b) does not accommodate the same kind of review that the Supreme Court engaged in *Heckler* and *Webster*. *See* Hearing Tr. at 6 (noting that *Topgallant* and *Webster* were "APA case[s]").

This court, therefore, has jurisdiction to review both prongs of the agency's findings that the override of the CICA stay was in the best interests of the United States and that it was necessitated by urgent and compelling circumstances. In conducting this review of both determinations, the court employs the arbitrary and capricious standard set forth in 28 U.S.C. § 1491(b).

**B. Analysis**

██ Based on the court's findings of fact drawn from the administrative record in this case, the court's task is to determine if the government's D & F authorizing the override of the CICA stay was based on assumptions or factual assertions that "are borne out by the record; and whether the factors relied upon by the contracting official were relevant or, conversely, whether factors relevant to the determination were ignored." *PGBA*, 57 Fed.Cl. at 659.

**1. Did DISA Have a Rational Basis for Finding That the Best Interests of the United States and Urgent and Compelling Circumstances Justified Continued Contract Performance?**

As an initial matter, it seems clear to the court that the government appropriately determined that it was both in the "best inter-ests of the United States" for the contract to continue and that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the [GAO] concerning the [underlying bid protest]." 31 U.S.C. § 3553(d)(3)(C)(i)(I), (II). This determination seems driven most by finding number five of the government's D & F authorizing the override, namely that "[a]n immediate need exists for qualified personnel to support, during September through December 2005, certain time-critical requirements." AR at 4(D & F).

If nothing else, the period from September through December, 2005, represents a critical period of performance in several international fora where the DOD's interests in spectrum allocation and management will be represented *vis-a-vis* those of other nations and commercial applications. The DOD has specifically identified international and regional spectrum forums, including all related national, regional, and international preparatory activities for the ITU WRC as primary responsibilities of concern in DOD's spectrum management policies. *Id.* at 96.

While the WRC itself does not begin until October 2007, the preparatory meetings and working groups associated with that conference meet well in advance to lay the foundations for the ultimate decisions to be made at the 2007 conference. Therefore, the DOD's long-term interests are best served through regular and active representation at those particular working groups and committee meetings where sensitive issues will be discussed. The Source Selection Authority and DSO officials implicitly recognized the importance of early and regular participation when they noted the importance of developing working relationships with other WRC participants, which typically arise through contractor participation in at least one "WRC cycle" that normally lasts two to four years. *Id.* at 9 (Source Selection Authority), 30 (SSAC Briefing); Hearing Tr. at 33–34.

As noted in AES's proposal in the Administrative Record, the DOD evaluated the relative concern of twenty-eight different agenda items that are to be discussed in some form at the 2007 WRC and categorized each

as being of high, moderate, or low concern. *Id.* at 208. Of the eight items identified as being of "high concern," they were to be discussed during seven different study groups. *Id.* Of those seven study groups considering items of "high concern" to the DOD—presumably the ones that are most critical to DOD's spectrum management objectives and policies—*all seven are scheduled to meet during the override period between September and December, 2005. See Id.* at 208 (identifying issues of "high concern" and the study groups addressing those issues), 221–22 (identifying specific working group meetings scheduled for the base year of the contract proposal, including the group and the month of the meeting), 206–07 (identifying individual WRC groups and noting AES's proposed participation in each).[9]

It must be remembered that DSO was seeking a contractor "to be fully engaged in the international community in order to defend key U.S. positions or counter proposals by opposing interests." *Id.* at 8. Having personnel attending theses meetings sooner, rather than later, would enable them to "establish adequate working relationships with international counterparts so as to be immediately effective in defending and advocating DOD's interests." *Id.* at 9. Without such active engagement in international working parties DOD's spectrum usage worldwide could be restricted.

The D & F determination that the September to December is "time-critical" was also based, in part, on scheduled domestic meetings addressing important issues. *Id.* at 4. The travel schedule of the DSO's proposed "National Team," which is comprised of government and contractor personnel, indicates that there are six meetings being held during the September to December period. AR at 288–89. Of these six meetings, four have been designated to be "Mission Critical (can't accomplish the mission without it)" and the other two have been designated "Mission Essential (has a significant, impact on the

teams's ability to accomplish the mission)." *Id.*

In both its briefs and at oral argument, plaintiff challenged the fact that there was any immediate need for the performance of the contract's requirements involving participation in these international fora and domestic meetings. Specifically, plaintiff maintained that the only scheduled international forum specifically identified in the administrative record was the WRC in 2007; according to plaintiff, therefore, there was no need for immediate performance over the next three months to prepare for a meeting more than two years away. *See* Hearing Tr. at 16 ("There is nothing in the record, other than a date of a meeting two years hence, November 2007, which has been specified by the government to support what they want."), 21 ("[T]here's nothing in the record to show that it is an exigency to me ... and there is no tracking of when these meetings have to happen."), 22 ("[T]here is no description of the urgent work in the record ... other than this meeting in 2007."), 23 ("Your Honor, for all I know, [the meetings] could all be in January, February, and that's not in the record."); Pl.'s Mot. for J. on the Admin. Rec. at 11 ("[In the D & F] DISA sets forth a list of 'international requirements' that it claims must be supported during the September–December, 2005 timeframe, but fails to establish any factual basis for that claim [and] fails to provide any dates for those 'forums.'"), 11–12 ("Thus, if support for the 'international forums' is the principal asserted justification for DISA's reliance on the 'urgent and compelling circumstances' exception to the CICA stay requirements, it ... is wholly inadequate and without a rational foundation.").

This argument, however, is simply belied by the uncontroverted evidence in the administrative record and inconsistent with the realities of the long-term planning needs for the major international fora identified as pressing interests by DOD. Plaintiff seems to

---

**9.** The administrative record cross-references the meeting schedule for the WRC groups with the ITU website, which lists scheduled meetings and events. While not included as part of the record, the website that is cross-referenced *does* verify that the meetings AES proposed to attend and

participate in are, in fact, scheduled at those times represented in AES's proposal. *See, e.g.,* http://www.itu.int/events/monthlyagenda.asp?lang=eng, last visited October 27, 2005 (schedule for October 2005 ITU events, including WRC meetings identified in AES's proposal).

have overlooked the fact that, contrary to its sweeping criticism that "no evidence" appears in the record supporting the government's findings in the D & F, there are indeed time-critical performance requirements during the override period that require DSO's—and its contractor's—attention. Both government and intervenor defendants' counsel confirmed this at the hearing. *See* Hearing Tr. at 29–36.

**2. Did DISA Have a Rational Basis for Finding That Only AES Was Capable of Performing the New Contract during the Override Period?**

Having established that the government did, in fact, have a time-critical need for performance of the services contemplated by the solicitation during the override period, the next issue for the court is whether DISA had a rational basis for determining that only AES could provide the necessary services. Plaintiff challenges that this decision was arbitrary and capricious because it failed to consider other contractors who may have been able to tender needed services until GAO issues its decision in January. As plaintiff's argument goes, if the contract called for performance of essentially the same tasks that Alion and other contractors performed under preexisting contracts, then it was unreasonable for the government to authorize performance by AES during the override period instead of merely extending the existing contracts for those same services to cover September–December 2005. *See, e.g., Chapman Law Firm Co. v. United States*, 62 Fed.Cl. 464 (2004) (noting that urgent and compelling circumstances for performance of a new contract did not exist where incumbent contractor was able and willing to perform under a contract extension during the override period).

In its D & F, the DSO concluded that:

4. It is imperative that AES–ITT continue contract performance.

A. This is new work. There is no incumbent contract that may be extended to provide the required support.

B. DSO does not have personnel to perform the work, and it [is] not likely that DSO could get permission to hire personnel with the appropriate skills and abilities, or that such newly hired personnel would arrive in time to perform the urgent work.

C. DSO cannot adequately augment their government staff with Intergovernmental Personnel Act (IPA) Mobility Program senior-level engineers with [appropriate experience] . . . .

D. The protestor, Alion, did not propose adequate personnel to perform these functions.

E. Only the awardee, AES–ITT, has the personnel available to perform immediately.

AR at 3–4 (Determination and Findings). The record supports these agency findings and confirms that the government had a rational basis in reaching the conclusions set forth in the D & F.

First, as for the contract being "new work," this finding is consistent with statements by agency officials and the actual solicitation involved in this case, itself. As the Director of Spectrum Management for DOD noted, the new solicitation "is for new work. The mission requirements for the DSO have recently changed from tracking and assessing technology innovations into conducting detailed spectrum engineering analysis to support DOD policy development and the planning required for the transformation of spectrum management processes." AR at 296 (Decl. of Badri A. Younes); *see also* AR at 293 (Decl. of Ralph D. Puckett) (discussing changes to DSO's mission objectives and explaining how the new mission objectives have presented DSO with new technical needs required of its contractors). Furthermore, the solicitation's Statement of Objectives made clear that DISA was "working to transform its capabilities" and that "DSO mission requirements have changed from technology roadmapping and assessment of technological innovation into hands-on implementation of the roadmap." AR at 96 (Statement of Objectives). It indicated that the new contract was necessary to obtain those advanced technical skills "required to meet the new technical complexities of the DSO mission requirements." *Id.*

Based on the portion of the Administrative Record submitted by the government, there appears to be sufficient evidence supporting the agency finding that the new solicitation was for "new work." Plaintiff attempted to demonstrate that the new solicitation called for essentially the same type of work as other existing contracts by supplementing the administrative record with statements of work from its own contract with DSO and those of other contractors. *See* AR 298–333. Contrary to plaintiff's presumed goal in supplementing the record with these materials, however, a comparison of the existing statements of work with the Statement of Objectives of the new solicitation reinforces just how different the contemplated scopes of work really are.

For example, under plaintiff's existing statement of work, plaintiff was asked to perform in what could generally be described as a research and report capacity. Specifically, plaintiff was directed to:

1. Provide technical R & D guidance and engineering support regarding emerging technology insertion . . . .

2. Conduct detailed research, survey and review of emerging technology R & D and trends, and analyze their implications on DoD spectrum management policy [and] strategy . . . .

3. Research, develop, document and support implementation of a revised DoD spectrum supportability process . . . incorporating the results [of the above studies]

4. Conduct a continuous, detailed survey, research and review of activities and trends in national and international [fora] . . . .

5. As directed, research and review for technical adequacy contributions submitted by national or international sources . . . .

6. Provide information analysis support to DISA initiatives . . . .

AR at 300–01. Based on this description of duties, plaintiff does not appear to have been engaged in "hands-on implementation" of DSO's spectrum management roadmap, as contemplated by the new solicitation. *See* AR at 96.

By contrast, the "Scope" section of the new solicitation's Statement of Objectives identified six core objectives that DSO hoped to achieve through the support provided under the new contract. The types of services contemplated by this "Scope" section seem, on par, more proactive than those described in plaintiff's existing contract. For example, under the new contract,

The DSO requires system engineering support where engineers and analysts are required to perform tasks ranging from developing positions, policies, [and] guidance to define and build a comprehensive DOD spectrum management architecture. This new acquisition will provide the DSO with the required system engineering support services to: (1) perform technical studies and mathematical modeling and simulation of current and future operational environments to develop long-term spectrum allocation and reallocation strategies . . . ; (2) devise long-term plans and strategies . . . .; (3) advocate, based on technical analytical studies, and lead all DOD national/international technical and technology outreach efforts primarily when it relates to the . . . International Telecommunication Union (ITU) activities, including future World Radiocommunication Conferences (WRCs) and other national/international efforts, in order to promulgate DOD spectrum policy and objectives that are . . . fully integrated in the DOD spectrum architecture;(4) develop and integrate enabling, spectrum efficient technologies into military systems to maximize spectrum utilization and to enable full spectrum transformation; (5) develop recommendations, based on technical analytical studies, for policies, strategies, regulations, and procedures to support the implementation and integration of emerging technologies to enhance spectrum utilization; [and] (6) devise DOD spectrum management architecture based on proposed spectrum management transition strategies and a comprehensive roadmap . . . .

AR at 96–97. Although lengthy, and couched in technical language, the statement of objectives makes it clear that the new contract would contemplate the contractor being an engaged player, rather than a passive one, in

pursuing DSO's mission. The contractor would be required to lead the charge in developing long-term strategies and integrating emerging technologies into those strategies. Indeed, it appears that the new contractor would be expected to be the primary driving force behind DSO's mission of developing and articulating DOD's spectrum allocation policies. Even plaintiff concedes this in its Complaint, where it notes that under the new contract "AES will support *and participate in the development* of spectrum strategies and policies." Compl. at 4 (emphasis added).

Plaintiff also supplemented the record with a statement of work from DSO's preexisting contract with SY Coleman Corporation. *See* AR at 304. To be fair, the description of SY Coleman's required work does appear to be similar to some of the requirements under the new solicitation. For example, it contemplates that SY Coleman would assist DSO "by coordinating and developing a Spectrum Management Net-centric Strategy plan" and "assist in the development of an implementation plan and roadmap for the approved strategy." *Id.* at 310. Unlike plaintiff's own contract, SY Coleman's statement of work does not appear to have required any of surveying and researching of technological developments that plaintiff was primarily responsible for. *See id.*

Notwithstanding—and this is key—nowhere in SY Coleman's statement of work is the contractor required to perform even an iota of advocacy before any of the international fora that is such an integral part of DSO's new solicitation. Indeed, there is no suggestion at all that SY Coleman was asked to, or was capable of, providing a scope of services that would accommodate DSO's needs before ITU planning groups in preparation for the WRC in 2007. *See also* AR at 317–33 (Scitor Corp. contract with Army Spectrum Management Office) (omitting any reference to advocacy before any international groups or any international travel). It is clear, however, that these services were imperative to DSO's mission and its compliance with DOD's spectrum management policies.

The agency's conclusion that the new solicitation contemplated "new work" that was different from work required under existing contracts was therefore a rational one. Based on the evidence available in the record, plaintiff has failed to demonstrate that this conclusion was arbitrary or capricious.

Since the solicitation demanded "new work," the necessary corollary to the government's finding must be that there was "no incumbent contract" that could be "extended to provide the required support." AR at 3(D & F). As demonstrated above, no single contract could have been extended to accommodate all of the work that the government sought under the new solicitation. Plaintiff argues alternatively that, rather than by extension of a single contract but instead by extension of some mixing-and-matching of the preexisting contracts, the government could have organized a patchwork of service providers that could have performed DSO's required services during the override period. Presumably, this might rise to the dignity of the *functional equivalent* of they kind of incumbent discussed in *Chapman*. *See Chapman*, 62 Fed.Cl. at 468.

Finally, then, the court's inquiry must focus on whether the agency had a rational basis for concluding that "[i]t is imperative that AES–ITT continue contract performance" and that "[o]nly the awardee, AES–ITT, has the personnel available to perform immediately." AR at 3–4(D & F).

Again, the evidence in the administrative record indicates that the agency's decision on this issue was a rational one. Agency officials indicated that DSO had originally tried to obtain a level of service required by DSO's changing mission requirements from its existing contractors, including plaintiff. AR at 293 (Decl. of Ralph D. Puckett). Of specific need to the DSO in support of its mission was "the need for proactive engagement via sound technical analysis to be reflected in national contributions to the ITU and other international forums." *Id.* This "detailed systems engineering and technical analysis in support of international spectrum policy development," however, "never materialized from Alion, or other contractors supporting [DSO], despite consistent guidance from the government." *Id.* It was the distinct impression of DSO officials that plaintiff's inabilities

were due in part to its lack of technical expertise, "including recent and relevant international experience [that was] needed to provide engineering analysis to support detailed ITU Working Papers and Recommendations." *Id.*

This concern over plaintiff's perceived lack of adequate staffing with appropriate technical expertise carried over into the source selection authority's evaluation of the proposal plaintiff submitted under the new solicitation. Of particular concern was plaintiff's ability to transition on to the project in a timely manner, to provide a start-up team that had the capacity to immediately support the international requirements. AR at 9 (Source Selection Authority Decision Memorandum) (noting that plaintiff's proposal presented the risk of "[i]nadequate guidance and direction of the contractor team to meet the international requirements" because the identified team leaders "do not have the required breadth and depth of international experience to support the DSO international objectives"). While the court here passes no judgment on the merit of the agency's analysis because that is properly the subject of the GAO's bid protest, these findings *do* suggest that the government had an acute concern that plaintiff could not perform the required international requirements of the new contract. *Id.*

The government also concluded that it would not be feasible for DSO to staff the contract with in-house personnel during the override period because there were insufficient employees with the necessary expertise readily available for assignment to DSO projects. *See* AR at 3(D & F) ("DSO cannot adequately augment their government staff with [experienced management]."). The government perceived a high risk that not enough additional government billets could be acquired within DSO, and that the general government hiring process was not conducive to quickly identifying and hiring available persons with appropriate expertise. AR at 50.

Based on these facts available in the record, the government seems to have been well supported in its conclusion that, of the available options, only AES was capable of performing this contract during the override period. DSO gave proper consideration to the type of services it required under the contract and the range of available offerors of those services. It contemplated whether plaintiff or other contractors could adequately provide those services during the override period, but ultimately concluded that those offerors lacked necessary technical skills to perform all of the time-critical tasks required under the contract.

In response, plaintiff essentially argues that the agency decisions on this issue were wrong. *See* Pl.'s Mot. for J. on the Admin. Rec. at 9–10. In its brief, plaintiff "dispute[d]" factual assertions. *Id.* at 10.

About the only time plaintiff relies on the administrative record to buttress any of its arguments is where it points to the government's evaluation of plaintiff's proposal in the "Technical Excellence" category. As plaintiff points out, the government's evaluation indicates that the "[p]roposal demonstrates an acceptable understanding of objectives and approach merits performance or capability." Pl.'s Br. in Reply to Def.'s Cross-mot. for J. on the Admin. Rec. at 4 (quoting AR at 26). "This rating also implies that while the proposal may have 'substantial weaknesses . . . that may impact the program . . . they are correctable with some government oversight and direction.'" *Id.* (alterations in original). As plaintiff's argument goes, the government's conclusion that only AES could perform the "international requirements" of the contract is belied by plaintiff's evaluation for the "Technical Excellence" category. Plaintiff holds this evaluation out as evidence that the government, itself, deemed plaintiff's proposal as adequate for performance and that plaintiff's pre-existing contract could therefore have been theoretically extended to provide all of DSO's needed services during the override period.

This argument, however, is a complete *non sequitur* because it ignores the very relevant fact that plaintiff's "Management Capability," another evaluation sub-factor, received a less favorable evaluation that potentially signals trouble with a proposal. AR at 15. According to the same sources plaintiff cited in its argument on the "Technical Excellence" pro-

posal criteria, its "Management Capability" evaluation signaled that the proposal "demonstrates a shallow understanding of the objectives .... Little, if any, strengths exist that are of benefit to the government; the weaknesses clearly offset the strengths. Weaknesses exist that adversely impact the program ...." AR at 12. So for plaintiff to argue that its proposal was, in fact, acceptable merely because it received a passable ranking for one of the proposal evaluation criteria seems to wholly overlook the fact that other evaluation criteria were stacked against plaintiff's proposal.

The problem that plaintiff is saddled with, then, is that nowhere in the record is there anything to suggest that the DSO erred in concluding that only AES was capable of performing the time-critical international requirements of the new contract, or that the agency overlooked key facts or was irrational in its interpretation of any facts. Given this position, it was incumbent upon plaintiff to introduce new materials to the administrative record that might have given support to its arguments. Unfortunately for plaintiff, it did nothing of the sort. *See* Hearing TR at 14 (Court: "But what is in the record that supports your position?" Pl.: "The D & F, itself, Your Honor."), 17 (Court: "I'm asking you what in the record supports your position? Can you point to something that I can hang my hat on?" Pl.: "... Alion's contract ..."), 18 (Court: "And so I'd like to know what you have in the record that supports your position. They have things in the record that supports their position, other than ... counsel's statement. Can you show me something in the Record? Page? Paragraph? Something?" Pl.: "Well, I've already pointed to Alion's existing contract, Your Honor."), 44 (Court: "... but the fact that you tell me something is not part of the record." Pl.: "I understand Your Honor's position."). Although given an opportunity to supplement the administrative record with documents that would provide it with a colorable argument in this court, the only documents plaintiff added to the record were the existing contracts of Alion, SY Coleman and

Scitor Corporation discussed above.[10] None of these documents, however, give much support to the arguments plaintiff raises here.

Instead, plaintiff seems to have overlooked a critical issue in this case, one that is almost always at the heart of any court's analysis of a case before it: the standard of review. In its moving papers, plaintiff advocated that the standard of review this court follows in a RCFC 56.1 proceeding is analogous to the summary judgment standard. *See* Pl.'s Mot. for J. on the Admin. Rec. at 3–4. Plaintiff relied on traditional summary judgment burden-shifting and presumptions to stake its claim. *Id.* Furthermore, plaintiff relied on its ability to defeat a Rule 56.1 motion, under the presumed summary judgment standard, merely by creating an issue of fact. *Id.* As the primary vehicle to establish its argument, plaintiff relied on the declaration of a senior Alion official who generally denied the veracity of the agency's D & F statement and indicated that plaintiff could, in fact, adequately perform any of the duties required under the new contract. *See* Compl. Ex. C (Decl. of Kalle R. Kontson).

The fallacy in this, of course, is that a Rule 56.1 motion does not incorporate summary judgment standards. Like all bid protest proceedings in this court, it is entirely a *record review* in which the court is largely confined to the administrative record in reaching its findings of fact and conclusions of law. *See Bannum*, 404 F.3d at 1354–56. Therefore, plaintiff was required to articulate the foundation for its arguments *based on the administrative record* or, if no support could be found for its arguments, *appropriately supplement the record with supporting documents.* In this case, it is not so much that the court doubts the veracity of Mr. Kontson, the Alion official whose declaration was submitted with plaintiff's complaint; instead, the problem is that *nowhere in the administrative record* can plaintiff point to any source of information that even tends to support the allegations Mr. Kontson—and plaintiff in its briefing papers—have asserted.

10. Plaintiff also supplemented the record with a portion of AES's proposal. *See* Pl.'s Unopposed

Mot. to Supplement the Admin. Rec.

Faced with a record that tends to indicate that the agency acted rationally in reaching its dual conclusion that performance of the contract is in the best interests of the United States and urgent and compelling circumstances that significantly affect interest of the United States will not permit waiting for the GAO's decision, the burden was on the plaintiff to demonstrate that the agency's decisions were arbitrary and capricious. It has failed to do so.

## V. Conclusion

Accordingly, for the reasons indicated above, and as noted at the October 21, 2005 hearing, the plaintiff's motion for a preliminary injunction is **DENIED**, and plaintiff's motion for judgment on the administrative record is also **DENIED**. The government– and the intervenor-defendants' respective motions for judgment on the administrative record are **GRANTED**, and the clerk of the court is **ORDERED** to enter judgment on behalf of the government and intervenor.